IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

INCOMM HOLDINGS, INC. and
INTERACTIVE
COMMUNICATIONS
INTERNATIONAL, INC.,

          Plaintiffs,

v.

GREAT AMERICAN INSURANCE
COMPANY,

          Defendant.

1:15-cv-2671-WSD

# OPINION AND ORDER

This matter is before the Court on a discovery dispute submitted by Plaintiffs InComm Holdings, Inc. and Interactive Communications International, Inc. (together, "InComm") and Defendant Great America Insurance Company ("Defendant"). The discovery dispute was submitted by e-mail on March 3, 2016 (the "March 3, 2016, E-mail"),[1] pursuant to Paragraph 10 of the Court's Standing Order Regarding Civil Litigation.

---

[1] A copy of the March 3, 2016, E-mail is docketed at [17.1].

### I.     BACKGROUND

On July 28, 2015, InComm filed its Complaint [1] against Defendant, asserting claims for breach of contract and bad faith related to a crime insurance policy issued by Defendant that names InComm as the insured.

InComm alleges that it is a technology company and provider of "prepaid products and payment systems solutions." (Compl. ¶ 11). One of InComm's products, its Vanilla Reload Network, allows consumers to add funds to previously purchased "general purpose reloadable card accounts" ("GPR"). (Id.). GPR cards are debit cards issued by credit and debit card companies, such as Visa or MasterCard, that are used by consumers when they add funds to the underlying GPR account connected to the debit card. (Id. ¶ 12).

InComm's Vanilla Reload Network sells consumers one-time use Vanilla Reload chits ("VRCs") to use to add funds to GPR accounts. (Id. ¶ 12-13). Consumers can purchase the VRCs at retail stores by paying the monetary value that is to be added to the GPR account, along with a service fee. (Id. ¶ 12). After the VRC is purchased, the VRC is activated and the VRC's unique identification number ("PIN") is assigned the applicable monetary value based on the amount purchased by the consumer. (Id. ¶ 13-14). A consumer can transfer the value of the VRC to the GPR account by logging into InComm's Vanilla Reload Network's

website or by using InComm's "computer-based IVR system," providing the VRC's PIN and the required GPR account information. (Id. ¶ 15). After a VRC is redeemed, InComm changes its state so that it can no longer be used, and InComm transfers the funds to a bank account held in the name of the GPR card issuer. (Id. ¶ 16).

InComm alleges that, in May 2014, it became aware that "hackers" had accessed InComm's IVR system and intentionally submitted multiple, simultaneous requests to redeem individual VRCs (the "2014 Fraud"). (Id. ¶ 17). By making multiple, simultaneous requests, the "hackers manipulated InComm's computer system so that the [VRCs] were redeemed for their full monetary value, but then returned to an active, unredeemed state. This, in turn, made the [VRCs] available for subsequent redemption and allowed the hackers to redeem [VRCs] multiple times, inconsistent with their intended use." (Id. ¶ 18). "InComm incurred a loss of $11,471,407 as a result of approximately 25,521 duplicate fraudulent redemptions of 2,396 individual reload chits" from the 2014 Fraud. (Id. ¶ 19).

InComm and Defendant are parties to a Crime Protection Policy, Policy No. SAA 347-89-10-08, with a policy period of June 1, 2013 to June 1, 2014 (the "Policy"). (Id. ¶ 20). The Policy's "Computer Fraud" Insuring Agreement

provides in pertinent part that "[Great American] will pay for loss of, and loss from damage to, money, securities and other property resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the premises or banking premises . . . to a person . . . outside those premises; or . . . to a place outside those premises."  (Id. ¶ 22).  On July 18, 2014, InComm submitted its proof of loss to Defendant regarding the 2014 Fraud and, on May 12, 2015, Defendant denied InComm's claim.  (Id. ¶¶ 23, 27).  On May 21, 2015, InComm contested Defendant's denial of coverage.  (Id. ¶ 28).  On June 11, 2015, Defendant responded by letter, reiterating its denial of coverage.  (Id. ¶ 29).

Discovery in this case is to be completed on or before June 20, 2016.[2] ([18]). On March 3, 2016, the parties submitted a discovery dispute to the Court for resolution pursuant to the Court's Standing Order Regarding Civil Litigation.  The discovery dispute concerns InComm's refusal to produce documents relating to a

---

[2]   On March 11, 2016, parties filed their Joint Motion for Extension of Time to Complete Discovery (the "Joint Motion").  The parties noted that they had been actively engaged in discovery and had produced over 20,000 responsive documents.  The parties asserted that they were working on obtaining third-party discover that had been unexpectedly delayed, and also needed to complete several remaining depositions.  In order to complete the third-party discovery, and the remaining depositions, the parties requested that the scheduling order be modified to provide that discovery be concluded on or before June 20, 2016, and that dispositive motions be due on or before July 15, 2016, and the pretrial order be due on June 20, 2016, or thirty days after the Court rules on any pending motions for summary judgment.  On March 16, 2016, the Court granted the Joint Motion ([18]).

2010 insurance dispute between InComm and Defendant that, according to Defendant, was denied for identical reasons it denied InComm's 2014 claim.

> Defendant alleges that in 2010:
>
> InComm sustained losses when third parties discovered they could charge more to debit cards than should have been available. After the charges were made, MasterCard reimbursed the retailers, and, in turn, InComm reimbursed MasterCard. In 2014, InComm sustained losses when third parties discovered they could increase the amounts chargeable to debit cards by making multiple, simultaneous requests over the telephone via InComm's interactive voice response system. As in 2010, InComm's loss occurred after the third parties charged more to the cards than should have been available, and InComm became contractually obligated to reimburse third parties to cover the transactions.

(March 3, 2016, E-mail at 1). Defendant alleges that InComm's losses in 2010 relating to the fraudulent use of debit cards (the "2010 Fraud"), like its losses from the 2014 Fraud, "were, at most, an indirect result of the alleged computer fraud because the direct cause was InComm's contractual liability to reimburse third parties for the debit card transactions." (Id.). InComm opposes Defendant's request for documents relating to the 2010 Fraud. (Id. at 2-5).

## II. DISCUSSION

Defendant argues that InComm's request for Defendant's entire file relating to the 2010 Fraud claim, which Defendant produced, establishes that InComm's documents relating to the 2010 Fraud claim are relevant. (March 3, 2016, E-mail

at 2). Defendant argues also that InComm's bad faith claim is premised on the allegation that Defendant had no reasonable basis to deny the 2014 Fraud claim. (Id. at 2, 6). Defendant contends that InComm's decision not to pursue the 2010 Fraud claim after it was initially denied by Defendant could be related to Defendant's interpretation of the computer fraud provision of the Policy. (Id.). If InComm found Defendant's interpretation of this provision to be accurate in 2010, it would suggest that InComm agreed to this interpretation of the contractual language when the Policy was renewed prior to the 2014 Fraud, supporting Defendant's argument that its denial of coverage was not in bad faith. (Id.). Finally, Defendant argues that the policy language relevant here is the same for the policy that was active for the 2010 claim, making InComm's prior dealings and its intent when it renewed the Policy relevant to interpreting the computer fraud provision. (Id. at 2, 6-7).

 InComm argues that its analysis of the 2010 policy language is not relevant to the current claim, because the loss in 2010 related to the fraudulent use of cards in retail stores, whereas the 2014 Fraud claim relates to the fraudulent manipulation of InComm's computer system, making InComm's interpretation of the policy in 2010 irrelevant to its interpretation of the policy as it relates to the 2014 Fraud. (Id. at 4-5). InComm argues that bad faith must be determined on a

case-by-case basis, and InComm's consideration of Defendant's denial of its 2010 Fraud claim is not relevant to whether Defendant acted in bad faith when it denied InComm's 2014 Fraud claim.  (Id.).  InComm argues also, to the extent the Policy is ambiguous, extrinsic evidence of InComm's intent when it agreed to the Policy is not relevant, because under Georgia law insurance contracts are construed against the insurance company.  (Id. at 5).  Finally, InComm argues that it requested Defendant's records on the 2014 Fraud claim only because Defendant relied on its denial of the 2010 claim as a basis to deny the 2014 claim.  (Id. at 4-5).

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."  Fed. R. Civ. P. 26(b)(1).  Relevance "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978).

Documents related to InComm's decision not to pursue its 2010 Fraud claim, and its understanding of the relevant policy provisions, are relevant to Defendant's defenses in this case.  Defendant argues that its denial of the 2010 Fraud claim, like its denial of the 2014 Fraud claim, were both premised on

InComm's losses resulting not from the underlying fraud, but instead resulting from InComm being required to cover the losses suffered by third parties—MasterCard and Visa—based on the fraudulent use of the debit cards. InComm's reasoning in not pursuing its 2010 Fraud claim are relevant to InComm's breach of contract claims and bad faith claims, because it may provide information about InComm's understanding of the contractual terms, or its knowledge of how Defendant interpreted them when it renewed the policy. See St. Paul Mercury Ins. Co. v. F.D.I.C., 774 F.3d 702, 711 (11th Cir. 2014) (if an insurance policy term is ambiguous after applying the rules of construction, "it may be necessary to consider extrinsic evidence to determine the parties' intent."). This is true even if the evidence is later determined to not be admissible. Rule 26(b)(1) states that "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). That these documents are relevant in this case is supported by InComm's request that Defendant produce documents in its possession related to its denial of the 2010 Fraud claim.[3]

---

[3] InComm argues that they only requested these documents because Defendant, in its June 11, 2015, letter, stated that it was denying the 2014 Fraud claim for the same reasons it denied the 2010 Fraud claim. (March 3, 2015, E-mail at 5). InComm mischaracterizes Defendant's June 11, 2015, letter. Defendant did not state that it was denying the 2014 Fraud claim for the same reasons that it denied the 2010 Fraud claim. Defendant stated that it denied InComm's claim because it was not covered and that InComm "knew [Defendant's] position

### III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiffs InComm Holdings, Inc. and Interactive Communications International, Inc. shall produce, on or before Monday, April 4, 2016, non-privileged documents that refer or relate to the 2010 Fraud claim that concern InComm's understanding about whether the policy in place in 2010 covered the 2010 Fraud claim and InComm's decision not to commence an action to challenge Defendant's denial of coverage of the 2010 Fraud claim.

**SO ORDERED** this 23rd day of March, 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

---

regarding one of the policy interpretation issues raised in your letter before it even purchased the policy because [Defendant] denied a similar claim submitted by InComm in 2010 for one of the same reasons it denied the current claim."  ([17.1] at 9).  Defendant, thus, did not rely on its denial of the 2010 Fraud claim to support its denial of the 2014 Fraud claim, but rather noted that the reasons for denying these claims were the same, and noting that InComm was aware of how Defendant interpreted the relevant Policy provision—the same defense Defendant raises now and to which InComm's documents relating to the 2010 Fraud claim are relevant.