IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


INCOMM HOLDINGS, INC., and
INTERACTIVE COMMUNICATIONS
INTERNATIONAL, INC.,

        Plaintiffs,

                          CIVIL ACTION FILE
vs.                       NO. 1:15-cv-02671-WSD

GREAT AMERICAN INSURANCE COMPANY,

        Defendant.

* * *

30(b)(6) DEPOSITION OF

INCOMM HOLDINGS, INC.

By

RONALD B. ROLLING

May 25, 2016

10:00 a.m.

Alston & Bird, LLP

1201 West Peachtree Street

Suite 4900

Atlanta, Georgia


Anne Hansen, RPR, CCR #2711

```
 1                    A P P E A R A N C E S

 2   On behalf of the Plaintiffs:

 3   DANIEL F. DIFFLEY, ESQ.
     Alston & Bird, LLP
 4   One Atlantic Center
     1201 West Peachtree Street
 5   Atlanta, Georgia  30309-3424
     (404)881-7000
 6   dan.diffley@alston.com

 7   RYAN LEWIS, ESQ.
     InComm Holdings, Inc.
 8   250 Williams Street, NW
     Atlanta, Georgia  30303
 9   (770)240-6100
     rlewis@incomm.com
10
     On behalf of the Defendant:
11
     MICHAEL A. GRAZIANO, ESQ.
12   F. JOSEPH NEALON, ESQ.
     Eckert Seamans Cherin & Mellott, LLC
13   1717 Pennsylvania Avenue, NW
     12th Floor
14   Washington, DC  20006
     (202)659-6671
15   mgraziano@eckertseamans.com
     jnealon@eckertseamans.com
16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2    RONALD B. ROLLING:                            PAGE:

3
          Examination by Mr. Graziano              5:5
4                            EXHIBITS

5
     NO.:        DESCRIPTION:                       PAGE:
6

7    1           Defendant's Notice of Deposition of
                 InComm Holdings, Inc. Under Rule
8                30(b)(6):
                                                   5:22
9
     2           Process Flow - My Vanilla:
10                                                 12:13

11   3           E-Mail from Crime Claims Re
                 Property Loss Notice - 05/23/14:
12                                                 23:21

13   4           E-Mail from Hale to St. Louis Re
                 Proof of Loss - 07/21/14:
14                                                 24:14

15   5           E-Mail from Brown to Meyerhoff Re
                 Vanilla Reload Network
16               Fraud/Vulnerability Version 2 -
                 05/12/14:
17                                                 36:11

18   6           List of Redemptions:
                                                   39:19
19
     7           Memorandum from Lewis - Skiba to
20               Meyerhoff Re Vanilla Reload
                 Multiple Chit Redemption Findings,
21               Status Update:
                                                   42:11
22
     8           E-Mail from Goldsmith Re Requested
23               Item RITM0054891 has been Completed
                 - 05/06/14:
24                                                 57:12

25

| NO.: | DESCRIPTION: | PAGE: |
|------|-------------|-------|
| 9 | E-Mail Chain Re VR Multiple Redemption Issue - The Fraudsters have caught on! - 05/06/14: | 60:16 |
| 10 | Letter from Purvis to Yeramsetty Re Connection Issues - 05/06/14: | 62:9 |
| 11 | Multiple Reloads on the same VRN Chit - Analysis- 07/17/13: | 64:22 |

(Pursuant to OCGA 15-14-37 (a) and (b), a

written disclosure statement was submitted by the

court reporter to all counsel present at the

deposition and is attached hereto.)

```
 1              (Defendant's Exhibit 1 marked.)

 2                         RONALD B. ROLLING,

 3   having been first duly sworn, was examined and

 4   testified as follows:

 5                         EXAMINATION

 6   BY MR. GRAZIANO:

 7       Q.  Good morning, Mr. Rolling.

 8       A.  Good morning.

 9       Q.  My name is Mike Graziano, and I represent

10   Great American Insurance Company.  I'm here to take

11   the deposition today of InComm Holdings, Incorporated,

12   under Rule 30(b)(6), the Federal Rules of Civil

13   Procedure.

14           I understand you have been designated to

15   testify on behalf of the company, correct?

16       A.  I have.

17       Q.  What is your full name, please?

18       A.  My full name is Ronald Bruce Rolling.

19       Q.  Is "Skeet" a nickname that you go by?

20       A.  It is.

21       Q.  All right.  I'm going to ask the reporter to

22   show you what's been marked as Exhibit Number 1.

23   Okay?

24       A.  Okay.

25       Q.  I'll slide it on over to you.  It's already
```

 1    been marked.

 2        A.   Okay.

 3             MR. DIFFLEY:   Thanks.

 4             MR. GRAZIANO:   Yes.

 5    BY MR. GRAZIANO:

 6        Q.   Exhibit Number 1 is -- Exhibit Number 1 is a

 7    notice of this deposition.   Have you seen the document

 8    before?

 9        A.   I have.

10        Q.   And my understanding -- I just want to make

11    sure we're on the same page -- is that you are being

12    designated to testify as to topics Number 7?

13        A.   Yes, sir.

14        Q.   Number 9?

15        A.   Yes, sir.

16        Q.   Number 12?

17        A.   Yes, sir.

18        Q.   Number 13?

19        A.   Yes, sir.

20        Q.   Number 15?

21        A.   Yes, sir.

22        Q.   Number 16?

23        A.   Yes, sir.

24        Q.   And Number 17.

25        A.   Yes, sir.

1       MR. NEALON: It would be better if you didn't

2 mark the documents, but whatever makes you

3 comfortable.

4       THE WITNESS: Okay. All right. I didn't

5 know if I was going to refer back, get a test here.

6       MR. NEALON: That is fine. And don't put it

7 on the record unless counsel wants it.

8       MR. DIFFLEY: I don't care.

9 BY MR. GRAZIANO:

10      **Q. Since you're testifying on behalf of the**

11 **company, if -- I'm going to take your answers as being**

12 **answers of the company as opposed to your own personal**

13 **answers. Understood?**

14      A. Sure.

15      **Q. So that means that if you tell me you don't**

16 **know something, I'm going to take that to mean that**

17 **the company does not know the answer to the question.**

18 **Fair enough?**

19      A. Okay.

20       MR. DIFFLEY: I'm going to object to that.

21 I'm sure that's entirely -- I'm not sure that's a fair

22 ground rule to lay not knowing a single question

23 that's been asked yet. So -- for example, you might

24 ask a question that we don't believe falls within the

25 scope of one these topics. And so --

1          MR. GRAZIANO:  If that occurs, you're free to

2     make an objection at that time.

3          MR. DIFFLEY:  Well, good.  I just did it to

4     get -- the framework that you tried to -- the ground

5     rule that you tried to lay, I object to it.

6     BY MR. GRAZIANO:

7       Q.  All right.  A couple other ground rules for

8     the deposition, and these ones are fairly simple.

9     Have you been deposed before?

10      A.  I have.

11      Q.  All right.  So if you want to take a break at

12    any time, just let me know.  And as long as you answer

13    whatever question's pending at that time, then I'll be

14    happy to accommodate you.

15      A.  Okay.

16      Q.  If you don't understand a question that I've

17    asked, ask me to clarify it, and I'll to do my best to

18    try to make some sense of it for you.

19          And finally, I ask that you wait until I

20    finish articulating the question before you answer.

21    And that's -- I'll try to do the same.  It makes it

22    easier for the court reporter if we're not talking

23    over the top of each other which is the normal thing

24    that can happen during a conversation.

25          All right.  So what is your current title

 1   with InComm?

 2        A.   Chief Operating Officer.

 3        Q.   How long have you held that position?

 4        A.   Since 2008.

 5        Q.   What did you do prior to 2008 for work?

 6        A.   Was in the InComm environment since 2006

 7   after an acquisition of a company that I helped to

 8   start.

 9        Q.   And instead of going through great detail in

10   your prior employment, can you give me a brief

11   background of your professional career and how you

12   became to become Chief Operating Officer of InComm?

13        A.   How far back do you want to go?

14        Q.   From the beginning, when you finished school.

15        A.   Okay.  When I finished school, I was in law

16   enforcement.  I was a police officer both in Columbus,

17   Georgia, and then a sheriff's deputy in Southwest

18   Florida.

19             Left law enforcement to enter corporate

20   security.  Was -- served as a security manager in

21   retail for a little over three years.

22             Left the retail environment to join the

23   banking industry as an investigator.  Moved through

24   the banking divisions for about 11 years with Columbus

25   Bank & Trust, which is the lead bank in the Synovus

1   family of banks.

2        Also Synovus, slash, CB&T was the starting

3   point of Total System Services.  I spent the next 10

4   years with Total System Services as the director of

5   security where I managed the development and delivery

6   of all of their fraud systems worldwide.

7        Was recruited out of Total Systems in 2003 to

8   help start ITC Financial Services in West Point,

9   Georgia.  We did that from 2003 until 2006, when it

10   was acquired by InComm.

11        Then once in the InComm environment, in 2008

12   was made the operating officer for ITC and still hold

13   that title today.  Initially it was ITC Financial

14   Licenses.  We changed the name late '14, I believe it

15   was 2014, to InComm Financial Services, Inc., only to

16   align it better as an InComm company.  And still

17   employed today.

18   **Q.  All right.  I want to go -- there's a lot of**

19   **acronyms that are used in the pleadings and in some of**

20   **the documents in this case.  I want to go through some**

21   **of these initially just to make sure we're speaking**

22   **the same language.**

23   A.  Sure.

24   **Q.  The complaint refers to something that's**

25   **called a GPR, General Purpose Reloadable card.  What**

1    can you tell me about that product?

2        A.   So -- so a GPR card is a prepaid debit card.

3    It can be either a Visa or a MasterCard or American

4    Express or Discover.  It refers to a card where there

5    is a registered holder for that card, and that card

6    can be reloaded.  It can have more funds applied to

7    that.  So you load and spend, load and spend.

8        Q.   All right.  And are -- is My Vanilla card a

9    term you would also use, refer to a General Purpose

10   Reloadable card?

11       A.   My Vanilla, yes.

12       Q.   And in addition, there's something called a

13   Vanilla Reload Chit, correct?

14       A.   That's correct.

15       Q.   That's VRC?

16       A.   And what?

17       Q.   Is that referred to as a VRC typically?

18       A.   Not by me, but I guess it could be.  Vanilla

19   Reload Card and Vanilla Reload Chit.

20       Q.   Vanilla Reload Chit, can you tell me exactly

21   what the purpose of that card is?

22       A.   Sure.  The Vanilla Reload Chit was a device

23   for the Vanilla Reload Network where you could load

24   both InComm or partner cards.  And that means you can

25   add additional funds to your card.

 1          For -- for a GPR card, there are a couple of

 2   ways to have funds put on that card.  One is through

 3   direct deposit.  In our case, you can mail in a

 4   reload.  You can also reload it purchasing a Vanilla

 5   Reload Chit at retail and then redeeming that chit to

 6   your account.

 7      **Q.  And am I correct in understanding that the**

 8   **transactions that form the basis of the insurance**

 9   **claim at issue in this case all relate to the use by**

10   **consumers of the chit cards to reload GPR's?**

11      A.  Yes, sir.

12          MR. GRAZIANO:  All right.  I'm going to ask

13   the reporter to mark Exhibit Number 2.

14          (Defendant's Exhibit 2 marked.)

15   BY MR. GRAZIANO:

16      **Q.  Can you tell me what Exhibit Number 2 is?**

17      A.  It is a process flow showing the application

18   of funds to the My Vanilla card.

19      **Q.  So there's a couple other terms here we**

20   **didn't talk about.  One is "Starter Card."  What is a**

21   **starter card?**

22      A.  Sure.  So a General Purpose Reloadable card

23   requires registration of the product prior to use.

24   And that means we have to know the bearer of that

25   card.  In order to do that, these are non-face-to-face

1    transactions.  So we capture name, address, date of

2    birth, and social, scrub that information against

3    commercially available databases and confirm to the

4    best of our ability that you either are or you are not

5    who you say you are.

6              The starter card is the way we get the

7    product in market.  It is a generic card.  Typically

8    in many cases under a -- a starter card pin range, and

9    that particular card is not tied to an identity.  It

10   hangs on a J hook in a card pack.  And that's how we

11   market and sell the cards.

12        Q.  I see.  So it's the same physical item as the

13   General Purpose Reloadable card but prior to that

14   individual card being linked to a cardholder?

15        A.  Once you go through the registration process

16   and you have confirmed your identity, we emboss and

17   encode a personalized card with your name on it.  And

18   we send that out to you via First Class Mail.

19        Q.  I see.  Another term on here is VMS.  What

20   does that mean?

21        A.  That is our processor, the VMS processor, for

22   the General Purpose Reloadable cards.  We -- we really

23   have two processors; one is VMS and the other handles

24   a lot of our gift card traffic.

25        Q.  What is the name of the processor that

1    handles the gift card traffic?

2        A.   Green card.

3        Q.   And IVR, what does that stand for?

4        A.   Interactive Voice Response.

5        Q.   That -- and that's -- so if I understand

6    that, that's when you make a phone call and enter --

7    it prompts you to enter information?

8        A.   That's -- that's a computer system whereby

9    people can redeem their chits to their respective

10   account through the use of that system.

11       Q.   So if I had a chit and I wanted to load it

12   onto my GPR, I would call a phone number --

13       A.   Right.

14       Q.   -- and that would connect me to an IVR --

15       A.   That's correct.

16       Q.   -- which would prompt me to put information

17   into it.

18       A.   That's correct.  It would prompt you for the

19   account number, and then it would prompt you for the

20   pin number.  Once you key in the pin number, the value

21   contained on that pin would be loaded to that account.

22       Q.   Is there any other information that would

23   prompt me for it during that process?

24       A.   It -- in some cases the -- it could be the

25   CVV2 value on the signature panel of the card.  And --

1    and that can vary from time to time.

2        Q.  And that -- what you're referring to, that's

3    the security code that's typically on the back of the

4    credit card?

5        A.  Yes, the three digit value on the back.  In

6    some cases they may ask for the expiration date of the

7    card.

8        Q.  All right.  Now, I understand the basis for

9    the insurance claim is that at some point some

10   individuals who had chits were able to redeem them

11   more than once, correct?

12       A.  That is correct.

13       Q.  What -- how were they able to do that?

14       A.  Through a code error in the IVR, that existed

15   in the IVR that allowed that to occur.  It allowed

16   that pin to be redeemed more than once.  And that's

17   the way they exploited that to cause the loss.

18       Q.  Were there -- was it a single error in the

19   programming, or were there more than one errors in the

20   programming that allowed for chits to be redeemed more

21   than once?

22       A.  There was a -- well, there was a single error

23   that allowed that to occur more than once.

24       Q.  And what was the error exactly?

25       A.  So the error in this case was where when the

 1    conspirators would call the IVR from two different

 2    phone lines at the same time and attempt to redeem

 3    that one pin, a single pin, from two different phone

 4    lines, the IVR would process one load, apply the funds

 5    to the account.  And then due to the error, it would

 6    roll that -- the second attempt would time out and

 7    then roll back to an active status.

 8        Q.  **Were there any other ways that a chit could**

 9    **be redeemed twice?**

10        A.  There were, yes.

11        Q.  **And what can you tell me about that?**

12        A.  Sure.  We had a separate instance that we

13    were already aware of where there was an issue with

14    the APS application, where if a chit was redeemed

15    during a timeout by a single individual, that the pin

16    would roll back to an active status and then could be

17    redeemed again.

18        Q.  **When you say "pin," are you referring to the**

19    **pin number associated with the chit?**

20        A.  Yes.

21        Q.  **This second issue you talked about a timeout.**

22    **Is that something that could be manipulated -- strike**

23    **that.**

24            **If I want -- if I knew that you had this**

25    **second issue, the timeout issue, and I wanted to take**

1    advantage of that to redeem the chit twice, what would

2    I do to accomplish that purpose?

3              MR. DIFFLEY:  Objection to form.

4              You can answer.

5    A.   You -- you wouldn't -- the -- the

6    conspirators or whomever, if there's a criminal

7    attempt to do that, they really wouldn't know whether

8    a timeout existed or not.  They would have no way to

9    know that.

10   BY MR. GRAZIANO:

11   Q.   Is there a way that a third party who is not

12   affiliated with InComm to cause that timeout issue to

13   occur?

14   A.   Not to my knowledge.

15   Q.   Can you explain exactly -- exactly what the

16   problem is with respect to the timeout issue?  What --

17   what is the -- what exactly happens from a technical

18   standpoint that allows the chit to be redeemed twice?

19   A.   Under which scenario?  The APS or a duplicate

20   redemption issue?

21   Q.   The duplicate redemption is when you're

22   referring to people making two simultaneous

23   transactions?

24   A.   Yes.

25   Q.   Then the APS issue.

1      A.  Okay.  So if you would ask your question one

2  more time.

3      **Q.  Yes.  What exactly is the technical issue**

4  **with respect to the APS issue, as you called it, that**

5  **allows for a chit to be redeemed twice?**

6      A.  As I understand it, if the redemption attempt

7  occurs during the timeout, it will allow that money to

8  be loaded, but it would also at that time roll that

9  pin back to an active status or that chit back to an

10  active status.

11      **Q.  And what are the causes of a timeout?**

12      A.  It -- there -- there can be many, many in the

13  card industry.  It could be on -- you could have

14  timeouts on the merchant side.  You have timeouts in

15  thunderstorms.  You have timeouts when servers blow

16  up.  I mean, there's any number of issues that could

17  cause a timeout.

18      **Q.  So is it fair to say that a timeout is just a**

19  **computer not responding to information as quickly as**

20  **it would have expected to?**

21      A.  I would describe it as a communication

22  failure between the two end points.

23      **Q.  Fair enough.**

24        **Okay.  So we've identified two technical**

25  **errors that could occur which would lead to a chit**

 1    being redeemed twice.  Are there any others that

 2    you're aware?

 3        A.  No, sir.

 4        Q.  All right.  You used the acronym "APS."  What

 5    does that stand for?

 6        A.  I don't know.

 7        Q.  Okay.  Fair enough.

 8            MR. NEALON:  That blows their case wide open.

 9    BY MR. GRAZIANO:

10        Q.  All right.  If we call it -- since we don't

11    know what the acronym APS is, can we call -- when you

12    refer to the APS, the timeout issue just for -- to

13    have a clear record?  Is that fair?

14        A.  That's a little broad.  It would be the

15    timeout issue related to the APS failure, if you

16    will --

17        Q.  Okay.

18        A.  -- or APS error.

19        Q.  I'm just trying to make sure we're

20    understanding each other.

21        A.  Okay.  Sure.  Sure.

22        Q.  I'm not trying to commit you to anything

23    other than what you've already said.

24        A.  Okay.

25        Q.  How does InComm distinguish between multiple

1    redemptions that occurred because of a timeout issue

2    versus a concurrent transaction issue?

3         A.   Related to this instance?

4         Q.   Yes.

5         A.   We could -- we could see the activity on the

6    IVR.  Once we understood and became aware of the

7    issue, we could see the activity on the IVR, see the

8    funds applied to one of the accounts and see that the

9    chit had rolled back to an active status.

10        Q.   So are there any multiple redemptions that

11   occurred because of a timeout issue that are part of

12   InComm's claim in this case?

13        A.   Well -- well, I think that -- that depends on

14   how you use the timeout issue.  And I want to be

15   really clear here.  Okay?

16             There are no APS-related issues in the InComm

17   claim that we're here to talk about today.  Okay?

18   Every dollar that's represented in the claim today is

19   related to the duplicate pin redemption issue whereby

20   those pins were attempted to be loaded from two

21   different phone numbers simultaneously through the

22   IVR.

23        Q.   That answers my question.

24        A.   Okay.

25        Q.   Now, talking about the -- setting aside the

1    timeout issue and just talking about the multiple

2    phone calls that you mentioned, when somebody -- when

3    these individuals who InComm claims were able to

4    redeem chits multiple times did so, is it just the

5    normal IVR system process that we talked about

6    earlier, but two different phone calls?

7        A.  Yes.

8        Q.  Is that --

9        A.  Yes.

10       Q.  So there would be two phone calls that made a

11   request to make the same transfer from a single chit

12   to a General Purpose Reloadable card?

13       A.  Correct.

14       Q.  And did those individuals, to the best of

15   InComm's knowledge, access any secure part of an

16   InComm computer system?

17       A.  No.

18       Q.  Did they provide any -- did they install any

19   kind of malware or viruses or anything of that nature

20   onto any InComm computer system?

21       A.  No.

22       Q.  Did they enter any false information into an

23   InComm computer system?

24       A.  Yes.

25       Q.  What information was false that they entered?

1    A.  Well, I would consider it false when you try

2  to confirm a pin twice.  There's one legitimate or

3  accurate entry.  The second one is false or

4  fraudulent.

5    **Q.  It's -- in each of those two instances, it's**

6  **the exact same information that's being entered**

7  **though, correct?**

8    A.  Yes.

9    **Q.  And does InComm have any knowledge about --**

10  **strike that.**

11      **Is each one of the transactions involved in**

12  **this claim arising out of a telephone call as opposed**

13  **to somebody using a computer to try to -- using their**

14  **own personal computer to try to transfer money from a**

15  **chit onto a GPR?**

16      MR. DIFFLEY:  Objection to form.

17  BY MR. GRAZIANO:

18    **Q.  If you understand it, you can answer.**

19      MR. DIFFLEY:  Vagueness was not the basis for

20  my objection.

21      MR. GRAZIANO:  I don't care what the basis of

22  your objection was.  I was just telling the witness he

23  can answer the question.

24    A.  I'm going to follow my counsel.

25      MR. DIFFLEY:  No.  You can answer if you --

```
 1              THE WITNESS:  Okay.

 2              MR. DIFFLEY:  He just was asking if you

 3    understood it.

 4              THE WITNESS:  All right.

 5              MR. DIFFLEY:  I objected to --

 6       A.  So ask it again then, please.

 7              MR. GRAZIANO:  Can you read the question

 8    back, please.

 9              THE REPORTER:  Question:  "Is each one of the

10    transactions involved in this claim arising out of a

11    telephone call as opposed to somebody using a computer

12    to try to -- using their own personal computer to try

13    to transfer money from a chit onto a GPR?"

14              MR. DIFFLEY:  Objection.

15       A.  They're all related to phone calls.

16    BY MR. GRAZIANO:

17       Q.  Oh.  Every transaction that's involved in the

18    claim.

19       A.  Yes.

20       Q.  Okay.  I'm going to ask the reporter to show

21    you Exhibit 3.

22              (Defendant's Exhibit 3 marked.)

23    BY MR. GRAZIANO:

24       Q.  And when I show you a document, you're free

25    to take as much time to look at it as you want or as
```

```
 1   little.  So just let me know when you're -- when

 2   you've had a chance, then I'll ask the questions.

 3        A.  Okay.

 4        Q.  And Exhibit 3 is the notice of loss that was

 5   provided to Great American in this case, correct?

 6        A.  Yes.

 7        Q.  And according to the cover e-mail, it looks

 8   like it was sent on May 23rd, 2014, correct?

 9        A.  Yes.

10        Q.  Do you know if InComm provided any earlier

11   notice about the claim to Great American?

12        A.  I would have to look at the date on the proof

13   of loss.

14        Q.  Okay.  We'll mark that as Exhibit 4 then.

15            (Defendant's Exhibit 4 marked.)

16            (Interruption.)

17            THE WITNESS:  Sorry about that.

18        A.  Okay.

19   BY MR. GRAZIANO:

20        Q.  Exhibit 4 is the proof of loss signed by you

21   and submitted to Great American, correct?

22        A.  Correct.

23        Q.  The date on the cover e-mail is July 21st,

24   2014.

25        A.  That's right.
```

1      Q.  Is it your understanding that that was the

2   date that the proof of loss was first provided to

3   Great American?

4      A.  That's the date this form was provided.  Yes.

5      Q.  Was there another form, proof of loss form,

6   that was provided on another date?

7      A.  My -- my point is, I don't know what verbal

8   notice was given.

9      Q.  All right.  Is it your understanding that

10  Exhibit 3, which we talked about a moment ago, is the

11  first time any written notice was provided to Great

12  American with respect to the claim?

13     A.  I don't know the answer to that.

14     Q.  Okay.  And you don't know if there was any

15  prior verbal notice that was provided by them?

16     A.  I do not.

17     Q.  Okay.  The first page of the proof of loss

18  says that the loss occurred between November 23rd,

19  2013, and May 11th, 2014; is that correct?

20     A.  Yes, sir.

21     Q.  And it also says that the loss was discovered

22  by InComm on May the 6th, 2014; is that also correct?

23     A.  Yes, sir, it is.

24     Q.  And I'm asking you -- I should have

25  clarified.  I'm asking you if that information is

1    true, not that's typically what's set out on the page.

2        A.  It -- it is true.

3        Q.  Okay.  Thank you.

4            All right.  There's an attachment that was

5    incorporated into the proof of loss.  It says "A

6    single chit was purchased for $500, had 272 duplicate

7    redemptions over a nine-day period for a total of

8    $136,000."

9            Are you aware of any single chit being

10   redeemed for a value that's higher than $136,000?

11       A.  I'm sorry.  I don't -- I don't have the

12   ranking.  Where -- where are you reading from?

13       Q.  Yes.  I apologize.  It's on the attachment.

14   It's Page 1 of 2.

15       A.  Okay.

16       Q.  It's the last sentence of the second to the

17   last paragraph.

18           MR. DIFFLEY:  He's reading from that

19   paragraph.

20           That one that starts "Our system"?

21           MR. GRAZIANO:  Yes.

22           MR. DIFFLEY:  Okay.

23       A.  So I -- I don't know that this was the

24   highest number of redemptions on a single chit.  But

25   this is as an example here, so.

 1    BY MR. GRAZIANO:

 2        Q.   Do you know what the highest amount of

 3    redemptions on a single chit was?

 4        A.   Not off the top of my head, no, sir.

 5        Q.   Do you know if any of them exceeded $500,000?

 6        A.   I do not.

 7        Q.   The next sentence in a new paragraph says

 8    "Upon redemption of a chit, InComm is liable to the

 9    VRN partner or its issuing bank."  What is a VRN as

10    referred to in this sentence?

11        A.   That is the Vanilla Reload partner.  That

12    would be the other programs that allow funds to be

13    loaded to their cards through the Vendor Reload

14    Network such as NetSpend or AMEX.

15        Q.   And Bancorp is a VRN partner also?

16        A.   Yes.

17        Q.   And is that -- is that information in here

18    because InComm claims that it incurred a loss when it

19    became liable immediately to the VRN partner or its

20    issuing bank?

21        A.   Is what information in there?

22        Q.   The information about the liability accruing.

23        A.   Is it accurate?

24        Q.   Well, yes.  Is it accurate?

25        A.   Well, rephrase your question.  Okay?

1        Q.  Well, I'll ask you the one that you asked me.

2    Is it accurate?

3        A.  Is which one accurate?

4        Q.  That upon redemption of a chit, InComm is

5    liable to the VRN partner or its issuing bank?

6        A.  It is.

7        Q.  And is that the basis for InComm's claimed

8    loss in this case?

9            MR. DIFFLEY:  Objection to form.

10       A.  So that liability in and of itself is not the

11   basis of the claim.  The fraudulent activity is the

12   basis of the claim.

13   BY MR. GRAZIANO:

14       Q.  What's the basis for the loss?

15       A.  What's the basis for the loss?

16       Q.  When does -- the dollar amount of the loss,

17   when -- what's the basis for the dollar amount of

18   InComm's loss?

19           MR. DIFFLEY:  Objection.  It's outside the

20   scope of this witness.

21           But you can answer if you know.

22       A.  The -- the basis for the loss is the total

23   number of invalid or fraudulent redemptions of the

24   chits that occurred due to this weakness or the

25   exploit of that weakness in our system.

1    BY MR. GRAZIANO:

2        **Q.  Let's boil this down to a single transaction.**

3    **At what point does InComm sustain a loss in connection**

4    **with the multiple redemption of a chit?**

5            MR. DIFFLEY:  Same objection.

6            But you can answer.

7        A.  Each time the chit is duplicated, it creates

8    a loss.

9    BY MR. GRAZIANO:

10       **Q.  And so let's say that -- take a single chit**

11   **being redeemed for a second time.  Does InComm -- does**

12   **InComm immediately lose money?**

13       A.  Yes.

14       **Q.  How so?**

15       A.  We have the obligation to honor that chit.

16   It's our product.

17       **Q.  So InComm is -- immediately has less assets**

18   **because it has a -- strike that.  That's poorly**

19   **framed.**

20           **InComm has an immediate liability to fund**

21   **that redemption, correct?**

22       A.  That's correct.

23       **Q.  And so InComm sustains a loss at that moment.**

24       A.  That's correct.

25       **Q.  The second clause of this same sentence says**

1    "The funds are immediately available to the VRN

2    partner's cardholder for spending or withdrawal"; is

3    that accurate?

4        A.  It is accurate.

5        Q.  Is there any delay from the moment the

6    process -- the IVR process is completed to when a

7    cardholder can use a card to make a purchase at a

8    merchant?

9        A.  In -- "any" is ambiguous.  Okay?  There's a

10   split second update from the IVR to the partner's

11   mainframe that makes it known that those funds are

12   available and available for use.  So when you say

13   "any," you know, a second could be any, but it is an

14   instantaneous update between the systems.

15       Q.  Okay.  So fair to say that any delay that

16   occurs is -- is just based on how quickly the

17   computers are processing the information.  It has

18   nothing to do with the transfer of any funds.

19       A.  That's correct.  You could swipe -- you can

20   -- you can load that chit at the store and -- and

21   those -- as soon as you apply it to your account, it's

22   immediately available.

23       Q.  All right.  The next sentence says "The

24   availability of such funds is not controllable by

25   InComm"; is that true?

1        A.  It is.

2        Q.  The proof of loss also says that, on the last

3    page at the very top, "This system was first exploited

4    on November 23rd, 2013."  Did that instance involve

5    multiple phone calls as we were talking about?

6        A.  Yes.

7        Q.  All right.  I want to talk about InComm's

8    discovery of the loss.

9        A.  Okay.

10           MR. DIFFLEY:  Are you finished with 4 here?

11           MR. GRAZIANO:  Yes, for now.  We're going to

12    go back to that one at a later time.

13           MR. DIFFLEY:  All right.

14    BY MR. GRAZIANO:

15        Q.  Who first discovered the loss that's the

16    basis for the insurance claim?

17        A.  In the InComm environment?

18        Q.  Yes.

19        A.  Our fraud department was notified.

20        Q.  You said "In the InComm environment."  Did it

21    -- is it your understanding that somebody outside of

22    InComm discovered the loss before InComm did?

23        A.  It is.

24        Q.  Who was that?

25        A.  CVS.

1        Q.  Did -- and what did CVS share with InComm?

2        A.  They shared that they became aware of a very

3   high volume of activity on May the 5th.  And they

4   filed a police report related to that very high volume

5   of activity.

6        Q.  May the 5th of 2014?

7        A.  Correct.

8        Q.  And when did CVS share that information with

9   InComm?

10       A.  On the morning of May the 6th.

11       Q.  And I take it that InComm at that point began

12  to investigate internally what was occurring?

13       A.  We did.

14       Q.  And who were the people who were involved in

15  doing that investigation?

16       A.  That would have been our fraud staff.  That

17  would have been myself.  That would have been our IT

18  team.  And that would have been our business team as

19  well as our accounting teams.

20            MR. NEALON:  Lots of teams.

21            THE WITNESS:  Lots of loss.

22  BY MR. GRAZIANO:

23       Q.  Who discovered at -- was it during the same

24  day that InComm learned that if multiple phone calls

25  were made to redeem a single chit that multiple

1    redemptions could be made?

2        A.   Yes.

3        Q.   Who made that discovery?

4        A.   Steve Bromley.

5        Q.   Steve Bromley?

6             Do you know approximately what time in the

7    day he made that discovery?

8        A.   I believe it was about 3:30 in the afternoon.

9        Q.   What was Steve Bromley's position?

10       A.   Technical genius.

11       Q.   Did he have a title, or was that the title?

12       A.   I don't know.  He -- you know what?  He's --

13   he's just a technical wizard.

14       Q.   Do you know what time he had started

15   investigating?

16       A.   I do not.

17       Q.   And was there an attempt at -- at that point,

18   at -- beginning at 3:30 when Steve made his discovery,

19   to stop -- to fix the issue that was causing multiple

20   redemptions?

21       A.   The attempt started as soon as we were

22   notified to identify the scope, the volume, the manner

23   of attack, where the exposure was, what the loss was,

24   all of it.  Multiple -- you know, multiple action

25   items after the first call.

1      Q.  Was InComm successful in fixing the

2   programming error that was causing multiple

3   redemptions?

4      A.  Yes.

5      Q.  When -- when did that occur?

6      A.  So we -- we were able to complete the design.

7   I believe that change occurred either late on the 6th

8   or the 7th, on May the 7th.  We continued to have some

9   issues float in for a few days after that.

10     Q.  But for the most part, it was either May the

11  6th or May the 7th of 2014 --

12     A.  Yes.

13     Q.  -- that the problem was fixed, right?

14     A.  That's right.

15     Q.  Did Steve -- other than the information from

16  CVS, did InComm receive any information from another

17  source that it did not already have as of May the 6th

18  that led it to discover the problem that was causing

19  multiple chit redemptions?

20     A.  Did we receive information from any other

21  source?  There -- there were several stores reporting

22  extensive sales of the Vanilla reload product and the

23  My Vanilla cards, the starter cards.  So yes, there

24  were multiple reports of -- of very high volumes of

25  activity.

1      Q.   Anything -- and did InComm receive any

2  relevant information from third parties other than a

3  high volume of sales being reported by the merchants?

4      A.   No.

5      Q.   Now, we referred to as the APS issue earlier,

6  you said that had been discovered at some point prior

7  to May 6th --

8      A.   Correct.

9      Q.   -- 2014?

10          When was that first discovered?

11     A.   I'm not sure.

12     Q.   Do you know if it was in 2013?

13     A.   I do not.

14     Q.   Did InComm sustain a monetary loss in

15  connection with multiple redemptions arising out of

16  the APS issue?

17     A.   The volume was very low.

18     Q.   So there -- there was a monetary loss, but a

19  low volume?

20     A.   If you have a duplicate redemption, there's a

21  monetary loss every time.  Yes, sir.

22     Q.   And that's because as soon as the redemption

23  occurs, InComm is liable to fund an account with

24  Bancorp, correct?

25     A.   That's correct.

1      Q.   When you say it was a low volume, can you

2   give me a ballpark figure?

3      A.   No, sir.

4      Q.   Did InComm make any claims based on loss

5   associated with the APS issue?

6      A.   No, sir.

7           MR. DIFFLEY:   I'll just object to that

8   question, and the last few are outside the scope of

9   the 30(b)(6) deposition.

10          (Defendant's Exhibit 5 marked.)

11          MR. GRAZIANO:   Okay.   Let's mark Exhibit 5.

12          (Defendant's Exhibit 5 marked.)

13     A.   Okay.

14   BY MR. GRAZIANO:

15     Q.   Are you familiar with Exhibit 5?

16     A.   Yes, sir.

17     Q.   Who is Bruce Brown?

18     A.   He was the CTO of InComm at the time this

19   event took place.

20     Q.   CTO, Chief Technology Officer?

21     A.   Yes.

22     Q.   And who is Scott Meyerhoff?

23     A.   Scott Meyerhoff is the COO and CFO of InComm.

24     Q.   Now, Exhibit 5 describes a -- or discusses a

25   final reconciliation report from the fall of 2013.

1    Can you tell me what that means?

2        A.   A reconciliation report would be where they

3    tie off the products sold and the amount redeemed.

4        Q.   Okay.  So the reconciliation report would

5    tell InComm whether there had been a greater amount of

6    redemptions than money received for the products that

7    were selling?

8        A.   Correct.

9        Q.   And how often did InComm do financial

10   reconciliation reports?

11           MR. DIFFLEY:  That's outside -- objection.

12   It's outside the scope.

13       A.   I don't know.

14   BY MR. GRAZIANO:

15       Q.   If I wanted to find out, who would I ask?

16       A.   Stephanie Granato would know.

17       Q.   Do you have any familiarity with this final

18   reconciliation report that was apparently done in the

19   fall of 2013?

20       A.   No, sir.

21       Q.   Do you know the amount of the discrepancy

22   that was found in the fall of 2013?

23       A.   I do not.

24       Q.   There's a -- this e-mail describes a

25   potential vulnerability with the reloads incurring a

 1    timeout.  Does that relate to either of the two

 2    situations we've been discussing this morning?

 3        A.  It relates to the APS issue.

 4        Q.  So fair to say that as of the fall of 2013,

 5    InComm knew that chits were being redeemed multiple

 6    times causing a monetary loss?

 7        A.  Through the APS vulnerability.

 8        Q.  It also says "Work was underway to correct

 9    this when the magnitude of the fraud came to light on

10    Tuesday."  Do you know what that refers to?

11        A.  You -- would you like me to infer what Bruce

12    is thinking?

13        Q.  I'm just asking what your understanding of

14    the sentence is.

15        A.  My opinion is he is referring to the

16    magnitude of the fraud that occurred through the

17    duplicate pin redemption issue.

18        Q.  My question was more about the work that was

19    underway to correct this issue, that part of the

20    sentence.  Do you know what that refers to?

21        A.  Well, the APS vulnerability had already been

22    identified, and the code work was being done to repair

23    that vulnerability.  So that was already underway.

24            When the duplicate redemption issue surfaced,

25    when we became aware on the 6th when we got the phone

1   call, the -- the initial fault was maybe it's related

2   to the APS issue.  We now know that's not true.

3      **Q.  So the -- if you fixed the APS issue, would**

4   **that not have stopped the caller from being able to**

5   **redeem multiple chits by making two phone calls?**

6      A.  No.

7      **Q.  Can you explain that to me?**

8      A.  Okay.  I'm -- I'm not a technical wizard.

9   Okay?  There are two different vulnerabilities.  One

10   was in the APS application.  The other is in the IVR.

11   So -- and they're unrelated.

12      **Q.  Who is Beth Goldsmith?**

13      A.  Beth Goldsmith is a project manager at InComm

14   in financial services.

15      **Q.  And she is currently employed?**

16      A.  She is.

17      **Q.  Based in Atlanta?**

18      A.  She is.

19      MR. GRAZIANO:  We'll mark this Exhibit 6.

20      (Defendant's Exhibit 6 marked.)

21      MR. DIFFLEY:  Are these four copies of the

22   same page?

23      THE WITNESS:  It looks like it.

24      MR. GRAZIANO:  You know what?  It looks like

25   it is.

1          MR. DIFFLEY:  That's fine.  You don't have to

2   -- just keep it.  But that's fine.

3   BY MR. GRAZIANO:

4          Q.  Exhibit 6, as Mr. Diffley pointed out, is

5   four copies of the same page.  What it is is a

6   printout from a spreadsheet that InComm provided to us

7   that appears to contain a list of the redemptions, the

8   multiple redemptions that occurred, and each day that

9   they occurred on.  Does that appear to be accurate to

10  you?

11         A.  Yes, sir.

12         Q.  And the total amount -- the grand total at

13  the bottom, $11,471,407, is the total amount of the

14  InComm claim?

15         A.  Yes, sir.

16         Q.  What kind of internal controls did InComm

17  have in place to discover any types of monetary losses

18  it would be sustaining in connection with the

19  redemption of chits?

20         MR. DIFFLEY:  At this time?

21  BY MR. GRAZIANO:

22         Q.  At the time of the loss, between November

23  2013 and May 2014.

24         A.  None.

25         Q.  Well, the -- we talked about the final

1    reconciliation report earlier.  Was that a regular

2    report that occurred?

3         A.  An accounting report, yes.  Yes.

4         Q.  Okay.  And there were no other internal

5    controls that would allow InComm to discover a

6    monetary loss by month, by day?

7         A.  No.

8         Q.  So InComm could lose $10 million and have no

9    idea?

10        A.  That -- that's not accurate.  Related to this

11   issue, we -- we had no visibility to this issue prior

12   to the time it was brought to our attention on the

13   morning of the 6th.  We had no idea that you could

14   trick the IVR through the duplicate redemption and

15   gain more money through that process.

16            So do we have systems in place to monitor

17   fraudulent activity?  Yes, we have many.  Did it pick

18   up this activity?  It did not.  We did not realize

19   this was a vulnerability nor that the exploit was

20   running, so.

21        Q.  Well, I'm not really asking about the

22   activity.  I'm asking about the monetary loss.  I

23   mean, according to this document, it looks like InComm

24   lost a million dollars in March of 2014 and had -- and

25   according to you had no idea; is that accurate?

1      A.   That is accurate.

2      Q.   **Who reconciled InComm's bank account?**

3           MR. DIFFLEY:  That's -- objection.  That's

4      outside the scope.

5      A.   There are dozens of bank accounts, and

6      they're reconciled in different areas.

7      BY MR. GRAZIANO:

8      Q.   **Fair.**

9           **How many bank accounts are used to transfer**

10     **money -- well, you know what?  Strike that.**

11          MR. GRAZIANO:  Let's go ahead and mark 7.

12          (Defendant's Exhibit 7 marked.)

13     A.   I'm familiar with the document.

14     BY MR. GRAZIANO:

15     Q.   **Can you tell me what Exhibit 7 is?**

16     A.   It's a recap of the activity leading --

17     related to the multiple chit redemptions.

18     Q.   **And it's not dated.  Do you know if there's**

19     **-- do you know what date this document was created?**

20     A.   I do not.  I believe there is a date that

21     points forward in the document that would give it some

22     context.

23     Q.   **All right.  Under -- on the first page, under**

24     **the heading "Financial," Number 2 says "There is a**

25     **current identified potential recovery of $1.9**

1    million."  Do you know what that refers to?

2        A.  I do.

3        Q.  What?

4        A.  It refers to accounts that were put in a

5    restricted -- or restricted status.  These are funds

6    in the FBO account at Bancorp on accounts that we had

7    identified were involved in the duplicate pin

8    redemption fraud.

9        Q.  Okay.  When you say the cards were put in a

10   restricted status, does that mean that the cardholders

11   no longer have access to the funds?

12       A.  It does.

13       Q.  And who placed the cards into a restricted

14   status?

15       A.  It was done at my direction.

16       Q.  Was it done by InComm, or was it done by the

17   bank?

18       A.  It was done by InComm.

19       Q.  So at your direction, an InComm employee made

20   a change to InComm's computer systems that blocked

21   access to the funds for the cardholders?

22       A.  That is correct.

23       Q.  Okay.  So then the proof of loss that InComm

24   had no control over the availability of funds, that

25   was wrong.

1        A.   No, sir.  It was accurate.

2        **Q.   Well, what did they reconcile --**

3        A.   In normal course of business, we had an

4   obligation, which we honor every day, and make those

5   funds available to that cardholder as soon as that

6   transaction occurs.

7             In the case of fraudulent activity, we have

8   an obligation and a duty, and we exercise it every

9   day, to stop fraudulent activity when we become aware

10  of it.

11       **Q.   And you have an ability in addition to a duty**

12  **to do that, correct?**

13       A.   We do.

14       **Q.   Okay.  The next sentence discusses NetSpend.**

15  **First of all, is -- are any of the transactions that**

16  **are a part of InComm's claim in this case related to**

17  **InComm's relationship with NetSpend?**

18       A.   Yes.

19       **Q.   And approximately how -- how much, the value,**

20  **the monetary number?**

21       A.   About a half-million dollars.

22       **Q.   Okay.  And what is sort of a broad**

23  **explanation?  I'm not asking for all the nitty-gritty**

24  **details.  But what's the difference between the**

25  **NetSpend program and the My Vanilla program?**

1  A. It has -- it -- in terms of the construct of

2 the product, the products work similarly. The

3 NetSpend product has a different program manager and a

4 different bank sponsor than the InComm products.

5  **Q. What is the role of the program manager?**

6  A. The program manager operates the program on a

7 day-to-day basis, has oversight for all the related

8 activities supporting the operation of the program.

9  **Q. And who is the program manager for NetSpend**

10 **products?**

11  A. NetSpend.

12  **Q. And was InComm the program manager for the My**

13 **Vanilla products?**

14  A. Yes. InComm Financial Services formerly

15 ITCFL, yes.

16  **Q. So an InComm related entity. Not InComm**

17 **Holdings --**

18  A. Yes. Correct.

19  **Q. -- but an InComm company.**

20  A. Yes, a sister company.

21  **Q. And does that mean that InComm did not have**

22 **access with respect to the NetSpend products to**

23 **restrict the use of cards after the loss was**

24 **discovered?**

25  A. That's correct.

1      Q.   Okay.  But NetSpend would have that ability?

2      A.   They would.

3      Q.   And did InComm request that NetSpend restrict

4  any of the cards?

5      A.   We did.

6      Q.   Did NetSpend do so?

7      A.   I can't tell you a hundred percent.  My -- my

8  response again is in some cases they did, but I can't

9  tell you that a hundred percent were restricted.

10     Q.   Okay.  Let's go back to the My Vanilla cards,

11  the potential recovery of 1.9 million.  Were there

12  actually $1.9 million that were frozen, or was it some

13  other amount?

14          MR. DIFFLEY:  Objection.  Form.

15          You may answer.

16     A.   I believe it was slightly more than that.

17  Well -- so as this issue unfolded -- again, we had

18  multiple tasks going on at the same time to identify

19  what had happened, effect the recovery where you can,

20  identify the people responsible, fix the issue, many,

21  many different things.

22          And our first effort to recover what had been

23  lost here, we cast a very broad net.  And our criteria

24  was very rough at that time to do what we could do to

25  recover where we could.  And by that I mean initially

1    we took any account that received multiple reloads

2    within the capture period, and we restricted those

3    accounts.  My recollection is there were about a

4    little over 10,000 accounts that were initially

5    restricted.

6          Once we determined exactly what had happened

7    with the duplicate pin redemption and the accounts

8    that had received such a duplicate pin redemption

9    load, we refined that block and released accounts that

10   were blocked in error.

11         So the final result of that is a net recovery

12   or -- of funds held of about $1.9 million.

13   **Q.  And where -- what happened to those funds**

14   **after the cards were restricted?**

15   A.  They are -- they are in the FBO account at

16   Bancorp.  And that's for the benefit of the cardholder

17   in the Bancorp account.

18   **Q.  And has InComm undertaken any efforts to**

19   **recover that money since the cardholders had committed**

20   **fraud alleged by InComm?**

21   A.  From the cardholders?

22   **Q.  Yes.**

23   A.  We -- we have blocked the receiving account

24   for those pins where funds were available.  So yes.

25   **Q.  And the funds are still presently in the**

1    account though.

2        A.   They are.

3        Q.   And InComm -- why are they still in the

4    accounts?

5        A.   I don't think any requests or demand's been

6    made for the funds.

7        Q.   Okay.  Why not?

8        A.   Because issues are still underway.

9        Q.   What issues?

10       A.   Well, the settlement of the claim, for one,

11   the -- you know, we're just not at a -- at a bottom

12   line situation here.

13       Q.   The settlement of the claim, you're referring

14   to the insurance claim?

15       A.   Yes.

16       Q.   So InComm hasn't requested the funds to be

17   released because it still hasn't -- because it's still

18   waiting to settle an insurance claim?

19       A.   You know, I don't know -- I don't know the

20   exact reason they've not requested the funds.  I know

21   the funds are still sitting on the respective accounts

22   in that FBO account.

23       Q.   Okay.  Do you know if the bank has raised any

24   objections to releasing the funds?

25       A.   I don't.

 1        Q.  All right.  Turn to Page 2 of Exhibit 7.

 2   Under the heading "Detection Issues," so Part 1, the

 3   first -- I'm sorry -- the second sentence says "The

 4   finance and accounting team performs a monthly close

 5   process which would have detected the issue."  What is

 6   the monthly close process referred to by this

 7   sentence?

 8        A.  That would be the comparison, where they look

 9   at the sales versus redemptions and -- and pins that

10   are still outstanding.

11        Q.  And those were performed on a monthly basis?

12        A.  Yes.

13        Q.  So if there was a million dollars discrepancy

14   in March of 2014 between redemptions and sales, that

15   -- that would have been discovered based on this

16   monthly close process?

17            MR. DIFFLEY:  Objection to form.

18        A.  So it was not discovered or brought to our

19   attention, would it be noted?  Yes, but in the context

20   of much larger numbers.

21   BY MR. GRAZIANO:

22        Q.  You said it -- it was not brought to your

23   attention.  Are you referring to yourself personally

24   or who -- strike that.

25            Who conducted the monthly close process?

1     A.   Jack Maloney.

2     **Q.   Is Jack Maloney an InComm employee?**

3     A.   He is.

4     **Q.   What is his role?**

5     A.   He's the CFO.

6     **Q.   The CFO.**

7          **So when you say it was not brought to your**

8     **attention, are you referring to yourself personally?**

9     A.   To -- to anyone's attention.  It was not

10    raised as an issue.

11    **Q.   Okay.  To your -- to the best of your**

12    **knowledge, did Jack Maloney actually perform the**

13    **monthly close processes?**

14    A.   Yes.

15    **Q.   Did anybody ask him why he had failed to**

16    **discover a one million dollar discrepancy in March of**

17    **2014?**

18         MR. DIFFLEY:  Objection to form.  There's no

19    foundation.  That's way outside the scope of this

20    particular 30(b)(6) topic, but you may ask him.

21    BY MR. GRAZIANO:

22    **Q.   Did you ask him?**

23    A.   I asked him if there were reconciliation

24    issues or out-of-balance conditions that -- the very

25    first thrust when we became aware of the issue.

1      Q.   What did he say?

2      A.   He said they had not noted them.

3      Q.   Were you satisfied with that answer?

4      A.   I was far too busy to argue about that

5   answer.

6      Q.   Did you go back to him once you weren't as

7   busy?

8      A.   We did.  We did.

9      Q.   Okay.

10     A.   And -- and we changed that process where it's

11  reconciled daily.  So yes, we did.

12     Q.   Well, what did he say about why he had failed

13  to catch the discrepancy when he was doing it on a

14  monthly basis?

15          MR. DIFFLEY:  Same objection.  Lack of

16  foundation.  You're putting words in the man's mouth.

17  There's no basis for that question.

18          MR. GRAZIANO:  Well, I think that he's

19  demonstrated he has personal knowledge.

20          MR. DIFFLEY:  That's not the point of my

21  question.  You're putting words in Jack Maloney's

22  mouth with absolutely no foundation for it.  You're

23  mischaracterizing his testimony.  That's twice now.

24          MR. GRAZIANO:  I don't think that's correct.

25  BY MR. GRAZIANO:

1          Q.   So you can answer the question.

2          MR. GRAZIANO:   Unless you're instructing him

3     not to answer.

4          MR. DIFFLEY:   I'm not going to instruct him

5     not to answer.   Just be careful with your questions.

6     That's all I'm asking.

7          MR. GRAZIANO:   I think I was careful.

8          MR. DIFFLEY:   Same objection.   And don't

9     argue.   Now you're being argumentative.

10         MR. GRAZIANO:   I would say you're the one

11    that's being argumentative.

12         MR. DIFFLEY:   Hardly.

13         Can you repeat the question back, please?

14         THE REPORTER:   Question:   "Well, what did he

15    say about why he had failed to catch the discrepancy

16    when he was doing it on a monthly basis?"

17         MR. DIFFLEY:   Objection to form.

18         MR. GRAZIANO:   That's not argumentative.

19         MR. DIFFLEY:   That was.

20         MR. GRAZIANO:   Agree to disagree.

21    A.   I don't recall his exact response.   We -- we

22    recognized that we needed to do things differently.

23    But I don't recall exactly what his response was.

24    BY MR. GRAZIANO:

25         Q.   Do you know if anybody else asked him why he

```
 1    hadn't caught the discrepancies prior to May of 2014?

 2             MR. DIFFLEY:  Same objection.

 3        A.   I know that we implemented the daily

 4    reconciliation process after that.

 5    BY MR. GRAZIANO:

 6        Q.   That was not -- that does not answer my

 7    question.  I just asked if you know if anybody else

 8    asked him why he --

 9        A.   Don't know.

10        Q.   -- had not caught the discrepancies --

11        A.   No, sir.  No, sir.

12             MR. DIFFLEY:  Same objection.

13             Careful not to talk over him while he's

14    asking his question.

15             THE WITNESS:  Sure.  Thank you.

16    BY MR. GRAZIANO:

17        Q.   The next heading in Exhibit 7 says "Actions

18    taken to date."  Paragraph 1 says "The IVR Logic was

19    modified and corrected on Tuesday, May 6th, 2014, in

20    the evening at approximately 9:00 p.m."  Does that

21    refer to the correction that stopped the multiple

22    redemptions from occurring?

23        A.   Yes, sir.

24        Q.   So it -- the problem was fixed essentially on

25    the same day that it was discovered?
```

1      A.  As I mentioned earlier, there were

2   transactions that came in after that for whatever

3   reason were still approved.

4      **Q.  Do you know what the approximate value of the**

5   **subsequent transactions is?**

6      A.  Not off the top of my head, no.

7      **Q.  Is it significant?**

8      A.  No.

9      **Q.  Paragraph 2 says "SAF was removed from the**

10  **merchant manager application on Tuesday at**

11  **approximately 9:00 p.m."  What is that -- what's the**

12  **difference between the IVR Logic and the SAF in these**

13  **two paragraphs?**

14     A.  SAF refers to storing forward transactions.

15     **Q.  What does that mean?**

16     A.  It means in the event of a timeout, the --

17  the system would capture and hold the transactions.

18  When communications were stored, they would be

19  forwarded.

20     **Q.  And that's the issue that was discovered in**

21  **the fall of 2013, or am I wrong?**

22     A.  I -- I believe you're wrong there.

23     **Q.  Okay.  So do both of these paragraphs 1 and 2**

24  **relate to actions that were taken to stop the problem**

25  **where consumers were making multiple phone calls and**

1 **redeeming chits multiple times?**

2  A. I don't know the answer to that question.

3 Okay? Some of these could have been performed -- and

4 I'm not trying to be difficult. Some could be

5 performed by the IT staff in the normal course of

6 their business. So I don't know the answer to that.

7  **Q. All right. If you turn to Page 3, under the**

8 **heading "Items in motion to complete," Paragraph 4,**

9 **subpart D says "A review of the transactions from some**

10 **of the offending chits show that the vulnerability was**

11 **well understood to exploit the system as early as**

12 **March 2014." What does that mean, if you know?**

13  A. Bullet 4 or what --

14  **Q. It's Paragraph 4, bullet D below it.**

15   MR. DIFFLEY: 4d, I think he's talking about.

16   THE WITNESS: 4d.

17   MR. DIFFLEY: Is that where you are, at the

18 top?

19   MR. GRAZIANO: Yes.

20  A. "A review of the transaction from some of the

21 offending chits showed . . ."

22   Again, so what's your question?

23 BY MR. GRAZIANO:

24  **Q. Do you know what that's referring to, that**

25 **sentence?**

1      A.  I do not.

2      Q.  **And this memo was drafted by Scott Meyerhoff,**

3  **correct?**

4      A.  By Jeff Lewis.

5      Q.  **Oh, I apologize.  Jeff Lewis, hyphen, Bob**

6  **Skiba.**

7      A.  Yeah.

8      Q.  **So who is Jeff Lewis?**

9      A.  Jeff Lewis is the VP in financial services at

10  InComm.

11      Q.  **And who is Bob Skiba?**

12      A.  Bob Skiba is an EVP at InComm.

13      Q.  **Executive vice president?**

14      A.  Yes.

15      Q.  **What department is he in?**

16      A.  Regulatory.

17      Q.  **Where is -- is Bruce Brown a current employee**

18  **of InComm?**

19      A.  He's not.

20      Q.  **Where is he these days?  Do you know?**

21      A.  No idea.

22      Q.  **Why did he leave?**

23          MR. DIFFLEY:  That's -- objection.  Outside

24  of the scope of the 30(b)(6).

25          MR. GRAZIANO:  Well, if he knows, he can

 1   answer.

 2        A.   I don't know.

 3             MR. DIFFLEY:   I agree.

 4             Is this a good point for a break?

 5             MR. GRAZIANO:   Yes.   I was just about to say

 6   that, actually.

 7             (Recess 11:17-11:32 a.m.)

 8             (Mr. Lewis is not present.)

 9             (Defendant's Exhibit 8 marked.)

10   BY MR. GRAZIANO:

11        **Q.   All right.   Mr. Rolling, you've been handed**

12   **Exhibit 8.   Please take a look at it and let me know**

13   **when you're ready to talk about it.**

14        A.   Okay.

15        **Q.   Who is Thomas Park?**

16        A.   He's an InComm employee.   I don't know what

17   he does.   Okay?   I -- I -- literally, I don't know.

18        **Q.   All right.   The e-mail at the bottom of**

19   **Exhibit 8 on the first page, it comes from an address**

20   **that says "ITSM," and it's incomm@service-now.com.**

21   **What is that e-mail?**

22        A.   Those are -- that would be like the NOC,

23   which is our Network Operations Center, command center

24   for IT operations for network-related activity.

25   "Service Now" is a ticketing system where you load

 1    trouble tickets for research and resolution.

 2        Q.  All right.  So multiple people have access to

 3    that ticketing system then?

 4        A.  Yes.  Every -- every employee in the company

 5    virtually can issue a Snow ticket.

 6        Q.  This seems to indicate that as of April 24th,

 7    2014, and it seems to me earlier there was a report

 8    requested that would show multiple VR redemptions on a

 9    daily basis; is that accurate?

10        A.  Appears to be.  Yes.

11        Q.  Do you know who requested that that report be

12    run?

13        A.  I do not.

14        Q.  Would that report have discovered the

15    multiple redemptions relating to simultaneous phone

16    calls that were being made --

17            MR. DIFFLEY:  Object to form.

18    BY MR. GRAZIANO:

19        Q.  -- had it been --

20            MR. DIFFLEY:  Objection to form.  It's

21    outside the scope.

22            You can answer if you know.

23        A.  I don't know the scope of the report, where

24    it would sit or what it would pull from.

25    BY MR. GRAZIANO:

1      Q.  Do you know if a daily report of multiple

2  redemptions was ever accomplished?

3      A.  It was.

4      Q.  When?

5      A.  On the 6th of May.

6      Q.  Do you have any idea why a request was made

7  to run a daily report on VR multiple redemptions prior

8  to May the 6th?

9      A.  Supposition is that it would be related to

10  the APS activity.  That's the only vulnerability we

11  knew about at that time.

12      Q.  And who knew about that vulnerability?

13      A.  I -- I don't have a list of people.  I would

14  say the IT team knew about it.

15          (Mr. Lewis enters.)

16  BY MR. GRAZIANO:

17      Q.  Then the top e-mail, it says "Consumers have

18  figured out we have a weakness and are exploiting it.

19  It has come to Skeet's attention, and he wants to see

20  this report."  Do you have any recollection of asking

21  to see the report described in this e-mail?

22      A.  I don't.

23      Q.  Did you know that the report had been

24  requested prior to May the 6th?

25      A.  No.

1        Q.  Oh, did you say -- did you use the term "Snow

2    ticket" earlier?

3        A.  I did.

4        Q.  What does that mean?

5        A.  That's just a trouble ticket.  Service Now,

6    it's a trouble ticket.  Every -- everything is routed

7    for investigation and review.  All IT related items or

8    -- or anomalies are controlled through -- we actually

9    have two systems.  Okay?  Snow is related to IT.  And

10   then there's a Jira ticket system that is more

11   consumer-related issues, where we track

12   consumer-related issues.

13           (Defendant's Exhibit 9 marked.)

14       A.  Okay.

15   BY MR. GRAZIANO:

16       Q.  The e-mail at the bottom of Exhibit 9 is --

17   is from Beth Goldsmith, who we discussed earlier, and

18   you're one of the recipients, correct?

19       A.  That's correct.

20       Q.  And it says "VR Multiple Redemption issue -

21   the fraudsters have caught on!"  Did you ask Beth what

22   they had caught on to?

23       A.  Did I ask her?

24       Q.  Yes.

25       A.  No.

1      Q.  Do you have an understanding of what she was

2  referring to?

3      A.  I do.

4      Q.  And what's that?

5      A.  At the time this unfolded, there were two

6  issues in play.  One we knew about.  One we did not.

7  My belief is that she was referring to the APS

8  exposure and the timeouts that we thought initially

9  was the issue.  And we subsequently determined that it

10  was not related to this.

11      Q.  I thought you told me earlier that there's no

12  way somebody -- a fraudster could manipulate the APS

13  issue we discussed to cause a multiple redemption

14  intentionally; is that true?

15      A.  There's no way they could manipulate or cause

16  a timeout intentionally to create that.

17      Q.  So what was there for them to catch on to --

18      A.  I don't know.

19      Q.  -- in that regard?

20      A.  I don't know.  Many times when weaknesses are

21  identified, they will work to exploit those weaknesses

22  if they have the ability to do that.  The -- the APS

23  issue was something that they had limited control on.

24  But when it hit, I think everybody's first assumption

25  is this may be related to the APS issue when, in fact,

1    it was not.

2        Q.  So -- so anybody that was able to redeem a

3    chit multiple times because of the APS issue just got

4    lucky as far as you know.

5        A.  Yes, sir.

6            (Defendant's Exhibit 10 marked.)

7        A.  I'm ready.

8    BY MR. GRAZIANO:

9        Q.  All right.  Exhibit 10 appears to be an

10   e-mail from Lindsey Purvis.  Is that an InComm

11   employee?

12       A.  It is.

13       Q.  And she's the lead fraud analyst?

14       A.  She is.

15       Q.  Is she currently the lead fraud analyst?

16       A.  She is one --

17       Q.  She is one.

18       A.  -- of several, yes.

19       Q.  In the second to the last sentence of the big

20   paragraph in the e-mail, it says "Within the past week

21   we have found a ring of fraudsters taking advantage of

22   the issues in North Carolina."  Do you know what that

23   refers to?

24       A.  I don't.

25       Q.  And this is dated May the 6th, 2014, correct?

1      A.   Right.

2      Q.   **Did you ever ask Lindsey what that referred**

3  **to?**

4      A.   So -- so at this time, at 11:22 on the 6th,

5  we would have been three hours, roughly, into the

6  notification related to the issue.  And we would have

7  been looking at the activity and where it was

8  occurring.  So if I infer what she was thinking, I

9  think she's referring to some of the activity they

10 would have observed on the accounts involved in this.

11     Q.   **Is -- you're inferring that she's -- strike**

12 **that.**

13          **The CVS branch that gave you the information**

14 **on the morning of May the 6th, where is it located?**

15     A.   I'm not -- I don't know exactly.

16     Q.   **Okay.  Are you aware of any ring of**

17 **fraudsters in North Carolina taking advantage of the**

18 **multiple redemption issue?**

19     A.   Yes.  Yes.  We had a concentration of

20 activity in South Carolina, some in North Carolina,

21 really all the way up I-85, with a major concentration

22 in Pennsylvania and in South Carolina.

23     Q.   **And that's -- you're speaking with the**

24 **concurrent transaction issue?**

25     A.   The duplicate pin redemption, yes.

1      Q.  Right.  So you believe that's what she is

2   referring to when she said "Within the past week we

3   have found a ring of fraudsters taking advantage of

4   the issues"?

5      A.  Yes.

6      Q.  But you're telling me that you actually did

7   not discover that until a few hours prior to her

8   sending this e-mail?

9      A.  That's correct.  That's correct.  She -- she

10  may be basing her observations on information she's

11  received from CVS.

12     Q.  So she could be saying CVS has noticed this

13  for a week.

14     A.  Correct.

15     Q.  That's not what the e-mail says.

16     A.  I understand that.

17     Q.  All right.  Who is Chad Bagwell?

18     A.  I don't know the answer to that.

19         (Defendant's Exhibit 11 marked.)

20     A.  Okay.

21  BY MR. GRAZIANO:

22     Q.  Are you familiar with Exhibit 11?

23     A.  Yes.

24     Q.  And can you -- tell me what it is.

25     A.  Prior to today or are you talking about right

1    now?

2        Q.   Prior to today.

3        A.   No.

4        Q.   Okay.  You've never seen it before today?

5        A.   Not that I recall.

6        Q.   Okay.  Do you recall anybody at InComm

7    looking into multiple reloads on the same VRN chit in

8    July of 2013?

9        A.   I believe we knew it was an issue with the

10   APS issue.

11       Q.   In July of 2013?

12       A.   I believe so, yes.

13       Q.   Do you know when that was first discovered?

14       A.   No, sir, I don't.

15       Q.   Do you know if it was prior to June 2013?

16       A.   Don't know.

17       Q.   When did it first come to your attention?

18       A.   The APS-related issue?

19       Q.   Yes, sir.

20       A.   I don't know the exact date.

21       Q.   Do you have an approximate date?

22       A.   Probably early in 2014.

23       Q.   Does Exhibit 11 refresh your recollection

24   about who Chad Bagwell is?

25       A.   I don't know Chad Bagwell.  I -- I don't.

1    2000 people in the company, I've not met them all.

2        Q.  I won't tell him you said that.

3        A.  Okay.

4        Q.  All right.  So when InComm took the steps to

5    restrict cardholder access to funds, did it inform

6    Bancorp it was doing that?

7        A.  Did not.

8        Q.  Was there any requirement to inform Bancorp?

9        A.  There was not.

10       Q.  Did Bancorp eventually inquire about it?

11       A.  They did.

12       Q.  And approximately when did that occur?

13       A.  Probably a month later they would have seen

14   the activity.  They get a flat file every day that

15   shows all activity that occurs on their accounts.  So

16   I would say probably within 30 days.

17       Q.  And did Bancorp ask for an explanation?

18       A.  They did.

19       Q.  Was one provided?

20       A.  It was.

21       Q.  How did Bancorp respond to that information?

22       A.  Thank you very much.

23       Q.  Okay.  Did Bancorp have any objection to the

24   -- to any of the restrictions on the cardholder

25   accounts?

1      A.   No.

2          Q.   Did it have a right to object?

3      A.   Did they have a right to?

4          Q.   If you know.

5      A.   Yes.   Sure.   They're the issuer of the card.

6          Q.   So could Bancorp change the status if they

7      wanted to?

8      A.   They could.

9          Q.   Did they?

10     A.   No.

11         Q.   Did there ever come a time when you had

12     concern over the FDIC inquiring about the restriction

13     of cards?

14     A.   Well, we -- we have a concern every day about

15     the FDIC inquiring about cards.

16         Q.   Specifically with respect to the restriction

17     -- the restrictions on cards whereas and of the

18     claim --

19     A.   And the BBB and the CFPB.   Not to be

20     flippant.   Okay?   We are passionate about the consumer

21     experience.   And we work hard every day to make sure

22     they have a good experience with our product.   So yes,

23     sir, we would be concerned about an FDIC inquiry.

24         Q.   Did the FDIC actually make any inquiries

25     about the restrictions that you put in place to stop

1    money from -- from falling off?

2       A.  I -- I believe they did, yes.  We get

3    escalations from multiple sources.  The FDIC would be

4    one.  The CFPB would be another.  BBB would be

5    another.  Executive escalations within the company or

6    in the bank, so.

7       Q.  Did the FDIC have any objection to any of the

8    restrictions that were placed on accounts?

9       A.  They asked for information about why the

10   sequence of events took place, and we furnished that

11   information.  I don't know what their opinion was

12   about whether they had objection to it.  Consumers

13   complain to them, and they look to resolve the

14   complaint.

15      Q.  Yes.  I understand.  I'm wondering if the

16   FDIC expressed any objection to InComm, not --

17      A.  No.

18      Q.  -- what their internal process was.

19      A.  No.  No.

20      Q.  Okay.  All right.  I want to talk about

21   InComm's investigation and the criminal investigations

22   that happened.

23      A.  Okay.

24      Q.  So who was involved in InComm's internal

25   investigation in terms of trying to discover who were

1  making the multiple phone calls?

2      A.  There were multiple people in our fraud team

3  and myself.

4      Q.  Who were the individuals on the fraud team in

5  addition to yourself?

6      A.  There would have been Mike Hudson, who is the

7  senior fraud manager.  There would have been Nigel

8  Carty, who is a fraud manager.  Lindsey Purvis, who is

9  a lead fraud analyst.  Jonathan Williams, who is a

10  senior investigator, and then multiple line level

11  employees below that.  There are like 36 people in the

12  fraud -- fraud team.

13      Q.  Okay.  And to your knowledge, which law

14  enforcement agencies have investigated the multiple

15  redemption issue?

16      A.  Have investigated it.  So it's been reported

17  to multiple agencies.  I don't know who has done what

18  in terms of investigating it.  I -- I don't know their

19  level of effort.  Okay?  Let me say it like that.

20      Q.  Well, I'm not asking you to express an

21  opinion on their level of effort.  I just want to know

22  -- and I don't need a list of everyone it's been

23  reported to.  I'm just wondering to the best of your

24  knowledge which law enforcement agencies have actually

25  undertaken some sort of investigation to discover what

1    the cause of the loss was.

2        A.  Not many.

3        Q.  Do you -- can you tell me?  Can you name some

4    for me or all of them?

5        A.  We limited -- well, we filed case files and

6    reports with Darlington, Florence in South Carolina,

7    with the Easton and Allentown Police Departments,

8    local jurisdictions, with the U.S. Attorney's office

9    in Columbus, Georgia, who referred us to the Secret

10    Service in Atlanta.  We filed them with the Secret

11    Service in Atlanta.  We have subsequently filed those

12    with the Federal Bureau of Investigation and have

13    ongoing and continuing dialogue related to whatever

14    level of investigation they've done.

15        Q.  Do you know if any law enforcement agencies

16    have brought criminal charges against any individuals

17    in connection with the issue?

18        A.  Not to my knowledge.

19        Q.  All right.  What ability -- what's the level

20    -- the scope of ability that InComm has to identify

21    the individuals who were involved in reloading chits

22    multiple times?

23        A.  What's the level of ability for the

24    individual?  So we -- we can identify the account, who

25    the registered holder of that account is, which we did

1    in these cases.  And -- and we go through -- we

2    mentioned the process we go through to register those

3    accounts; the name, address, social, and date of

4    birth.  In some cases those were true named

5    identifications and it was the actual person.  In

6    other cases it likely was identity theft, so.

7    **Q.  And what you're referring to are the GPR**

8    **cards, correct?**

9    A.  Correct.

10    **Q.  The chits themselves are not registered to**

11    **any individuals or --**

12    A.  That's correct.  That's correct.  We have no

13    idea who bears that chit.

14    **Q.  Do you have any way of finding out who**

15    **purchased an individual chit?**

16    A.  In some cases, if identification was taken at

17    the point of sale, that would be known by the

18    retailer.  Typically it would be made available to law

19    enforcement under a subpoena.  So they don't -- they

20    don't typically give us purchase information or

21    customer-related information.

22    **Q.  Okay.  So did any retailers share customer**

23    **identification with you --**

24    A.  No.

25    **Q.  -- in connection with chits?**

1         Okay.  Did the law enforcement -- any law

2    enforcement agency share that information with you?

3         A.   Shared purchaser information for the chits?

4         Q.   Exactly.

5         A.   No.

6         Q.   The documents that InComm produced that

7    showed that there was some video surveillance that was

8    produced by 7/11 -- correct?

9         A.   Sounds right.

10        Q.   -- was InComm able to identify any

11   individuals based on surveillance?

12        A.   Not to my knowledge.

13        Q.   Does InComm -- did InComm do anything to

14   determine the identity of individuals for making phone

15   calls to the IVR system?

16        A.   Did we do anything?  Yeah.  We -- we made

17   that information available to law enforcement.  The

18   number dialed from is a part of every criminal profile

19   that we forwarded for investigation.  So yes.

20        Q.   Does InComm have any information about

21   linking the identity of an individual to the phone

22   numbers that were used to make the -- the calls?

23        A.   Only in one instance that comes to my mind,

24   and that's Devon Ralph, a guy in Easton, Pennsylvania.

25   Or Allentown, Easton, Pennsylvania.

 1    Q.  Is there any other tool or method that InComm

 2    used to identify the individuals who were involved at

 3    any step of the process?

 4    A.  In terms of the identity of the account

 5    holder?

 6    Q.  The identity of the individuals who purchased

 7    the chits who made the telephone calls, who used the

 8    cards to make purchases at merchants or ATM

 9    withdrawals later on, at any point during the process.

10    A.  No.

11    Q.  Okay.  Has InComm or to InComm's knowledge

12    any third party discovered an instance in which a

13    single individual is connected with a loss exceeding

14    $500,000?

15         MR. DIFFLEY:  I'm sorry.  Did you say any

16    third party?

17         MR. GRAZIANO:  Yes, a law enforcement agency,

18    for example.

19    A.  Has any law enforcement agency identified --

20    BY MR. GRAZIANO:

21    Q.  Let me rephrase it.  Is InComm aware of any

22    single individual who was involved in a multiple

23    redemption-related loss exceeding $500,000?

24    A.  No.

25    Q.  Is InComm aware of a connection between any

 1   individuals who were involved in losses which in the

 2   aggregate exceeded $500,000?

 3       A.   The true identity?

 4       Q.   Well, true identity, false identity, is

 5   InComm aware of any group of individuals who are

 6   somehow connected together and caused a loss in the

 7   aggregate that exceeds $500,000?

 8       A.   Yes.  Yes.

 9       Q.   Okay.  And tell me about that group of

10   individuals.

11       A.   So -- so we prepared a list of high-value

12   targets for law enforcement based on several different

13   factors, based on the geographical distribution of

14   where these people lived, given the name, information

15   that we had; based on the account level activity;

16   based on the number of times a pin was redeemed; based

17   on the relationships of those pins from one to many

18   accounts, and -- and a lot of different sortations

19   which we felt would be helpful to law enforcement to

20   investigate and resolve the issue.

21       Q.   So to make sure I understand what the

22   connections are, the first was geography, correct?

23       A.   Correct.

24       Q.   So -- and the only -- and does InComm know --

25   well, what geographical locations had losses exceeding

1    $500,000?

2        A.   I -- I don't know.  I can't tell you state by

3    state.  There's a distribution in the -- in the

4    information that we gave you that showed all the pin

5    redemptions by state.  If you'd like to pull that

6    document, I can certainly attest to that.

7        **Q.   Who -- you mentioned that there were high**

8    **target groups.  What is that?  What were you referring**

9    **to when you said that?**

10       A.   Well, they are -- they are -- "high-value

11   targets" is the term I used.

12       **Q.   Okay.**

13       A.   And we took -- I believe we took the top 20

14   accounts based on load activity, again, in -- in

15   trying to -- to be of assistance to law enforcement to

16   get an investigation initiated here.

17       **Q.   Okay.  So when you say the accounts -- the**

18   **"top 20 accounts based on load activity," that's**

19   **statistical information that you provided in the**

20   **documents that were produced in this case, correct?**

21       A.   It's account level detail and information by

22   -- activity by city, by state, by account number, by

23   the caller ID, the ANI, the automatic number

24   identification that was captured related to the

25   account.  So every investigative thread that we could

 1    make available to them, we made available to them.

 2        Q.  What's the monetary amount associated with

 3    the top 20 targets that you mentioned?

 4        A.  I don't know the answer to that.

 5        Q.  Are you aware of any instances in which a

 6    single GPR was involved in a loss exceeding $500,000?

 7        A.  Not off the top of my head, no.

 8        Q.  Okay.  I asked you earlier about whether

 9    InComm's aware of a connection between any individuals

10    involved in a loss exceeding $500,000, and you said

11    yes, and I asked a follow-up question.  What I'm

12    wondering is, besides the statistical information we

13    were provided in -- in terms of geography, account

14    numbers, things like that, is there any other known

15    connection between individuals who were involved with

16    the GPR cards?

17        A.  So I wouldn't consider it statistical

18    information.  I would consider it account-related

19    activity for the high-value targets.

20        Q.  Okay.  With that caveat, is there any other

21    known connection between individuals involved in a

22    loss exceeding $500,000?

23        A.  Do we believe there's an association?

24        Q.  I'm not asking for your belief.  I'm asking

25    for what you know.

1      A.  I don't know.  I don't know.

2      Q.  Okay.  Did -- did you ever come to an

3  understanding of how information about the ability to

4  redeem chits multiple times spread to the individuals

5  who used that information, apparently?

6      A.  No.

7      Q.  Are there any -- did you discover there was

8  any criminal gangs that were involved in the losses?

9      A.  The Devon Ralph that I mentioned initially

10  had -- apparently had ties to the Bloods.  We -- we

11  did do word string searches through the NCFTA to

12  attempt to identify chatrooms or dark websites where

13  they might be discussing this type of exploit.  We did

14  not find anything concrete that showed any electronic

15  communication related to this that we could find.

16  Given the gang activity, we surmised it was probably

17  cell phone related, so.

18      Q.  And you used an acronym that I'm not familiar

19  with.  NCFTA, I think it was.

20      A.  That's the National Cyber-Forensics &

21  Training Alliance.

22      Q.  And other than Devon Ralph, did you discover

23  any other individuals who were connected to the loss

24  in some manner who were also connected with the

25  Bloods?

1      A.   No.

2      Q.   Do you know the monetary amount of the loss

3   associated with Devon Ralph?

4      A.   I don't.

5      Q.   Did InComm obtain any recoveries from any

6   individuals who were involved in the multiple

7   redemptions?

8      A.   $1.9 million.

9      Q.   And when you say that, you're referring to

10   the amount that was frozen in the FBO account?

11      A.   That's correct.

12      Q.   Any recoveries other than that?

13      A.   No.

14      Q.   And just for clarification, you believe the

15   $1.9 million is actually more, but you're not sure of

16   the exact number as you sit here today?

17      A.   No.  I believe it's 1.9 million.

18      Q.   Okay.

19      A.   Change -- and change.  Okay?  Approximately

20   1.9 million.

21      Q.   I'm not going to hold you to the change.

22      A.   Okay.  I don't recall the actual dollar

23   amount.

24           MR. GRAZIANO:  Can we take a quick break?

25           MR. DIFFLEY:  Sure.  Sure.

```
 1              (Recess 12:06-12:16 p.m.)

 2         MR. GRAZIANO:  I'm done.  All right.  I'm

 3   finished with the questions for today, so we'll resume

 4   tomorrow with the witness who's being designated on

 5   the remaining topics for the 30(b)(6) deposition.

 6         MR. DIFFLEY:  That's good.  And Mr. Rolling

 7   will read and sign his portion of the transcript.

 8         MR. NEALON:  That's fine.

 9         (The deposition adjourned at 12:18 p.m.)

10         (Signature reserved.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CERTIFICATE segment

```
 1              C E R T I F I C A T E

 2   STATE OF GEORGIA      )
                           )
 3   COUNTY OF HENRY       )

 4          I hereby certify that the foregoing

 5   deposition was taken down, as stated in the caption,

 6   and the colloquies, questions and answers were

 7   reduced to typewriting under my direction; that the

 8   foregoing transcript is a true and correct record of

 9   the evidence given.

10          The above certification is expressly

11   withdrawn and denied upon the disassembly or

12   photocopying of the foregoing transcript, unless

13   said disassembly or photocopying is done under the

14   auspices of AHReporting, Certified Court

15   Reporters, and the signatures and original seal is

16   attached thereto.

17          I further certify that I am not a relative

18   or employee or attorney of any party, nor am I

19   financially interested in the outcome of the action.

20          This, the 7th day of June, 2016.

21

22                    _____

                      Anne Hansen
23                    Registered Professional Reporter
                      Certified Court Reporter, #2711
24                       Commission expires 3/31/2017

25
```

```
 1                D I S C L O S U R E

 2   STATE OF GEORGIA    )
                         )
 3   COUNTY OF HENRY     )

 4

 5          Pursuant to Article 10.B of the Rules and

 6   Regulations of the Board of Court Reporting of the

 7   Judicial Council of Georgia, I make the following

 8   disclosure:

 9          I am a Georgia Certified Court Reporter

10   here as a representative of AHReporting to

11   report the foregoing matter.

12          AHReporting is not taking this

13   deposition under any contract that is prohibited by

14   O.C.G.A Sec. 9-11-28 (c).

15          AHReporting will be charging its usual

16   and customary rates for this transcript.

17

18

19

20

21

22

23

24

25
```



## Errata Sheet

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure or the applicable state rules, any changes in form or substance which you desire to make to your deposition testimony shall be entered upon the deposition with a statement of the reasons given for making them.

To assist you in making any such corrections, please use the form below. If supplemental or additional pages are necessary, please furnish and attach them to this errata sheet.

I, the undersigned, _RONALD B. ROLLINS_ do hereby certify that I have read the foregoing deposition and that to the best of my knowledge said deposition is true and accurate (with the exception of the following corrections listed below).

Page _13_ Line _8_ Should read: _-- A STARTER CARD BIN RANGE_
Reason for change: _INCORRECT TERM_

Page _27_ Line _13_ Should read: _VANILLA RELOAD_
Reason for change: _INCORRECT TERM_

Page _54_ Line _14_ Should read: _... STORE AND FORWARD_
Reason for change: _INCORRECT TERM_

Page_____Line_____Should read: _____
Reason for change: _____

Page_____Line_____Should read: _____
Reason for change: _____

Page_____Line_____Should read: _____
Reason for change: _____

Page_____Line_____Should read: _____
Reason for change: _____

Page_____Line_____Should read: _____
Reason for change: _____

Page_____Line_____Should read: _____
Reason for change: _____

Page_____Line_____Should read: _____
Reason for change: _____



Page_____Line_____Should read: _____
Reason for change: _____

Page_____Line_____Should read: _____
Reason for change: _____

Page_____Line_____Should read: _____
Reason for change: _____

Page_____Line_____Should read: _____
Reason for change: _____

Page_____Line_____Should read: _____
Reason for change: _____

Page_____Line_____Should read: _____
Reason for change: _____

Page_____Line_____Should read: _____
Reason for change: _____

Page_____Line_____Should read: _____
Reason for change: _____

Page_____Line_____Should read: _____
Reason for change: _____

Sworn to and subscribed
Before me this 30th day
of June , 20 16 .

Deponent's Signature: _____

Notary Public Signature: _____
My Commission Expires:
July 1, 2018

CHERYL WILLS
MUSCOGEE COUNTY, GEORGIA
NOTARY PUBLIC
MY COMMISSION EXPIRES
JULY 1, 2018