IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


INCOMM HOLDINGS, INC., and
INTERACTIVE COMMUNICATIONS
INTERNATIONAL, INC.,

        Plaintiffs,

                        CIVIL ACTION FILE
vs.                       NO. 1:15-cv-02671-WSD

GREAT AMERICAN INSURANCE COMPANY,

        Defendant.

* * *

30(b)(6) DEPOSITION OF

INCOMM HOLDINGS, INC.

By

STEPHANIE GRANATO

May 26, 2016

9:10 a.m.

Alston & Bird, LLP

1201 West Peachtree Street

Suite 4900

Atlanta, Georgia


Anne Hansen, RPR, CCR #2711

```
 1                 A P P E A R A N C E S

 2
    On behalf of the Plaintiffs:
 3
    DANIEL F. DIFFLEY, ESQ.
 4  Alston & Bird, LLP
    One Atlantic Center
 5  1201 West Peachtree Street
    Atlanta, Georgia  30309-3424
 6  (404)881-7000
    dan.diffley@alston.com
 7
    RYAN LEWIS, ESQ.
 8  InComm Holdings, Inc.
    250 Williams Street, NW
 9  Atlanta, Georgia  30303
    (770)240-6100
10  rlewis@incomm.com

11
    On behalf of the Defendant:
12
    MICHAEL A. GRAZIANO, ESQ.
13  Eckert Seamans Cherin & Mellott, LLC
    1717 Pennsylvania Avenue, NW
14  12th Floor
    Washington, DC  20006
15  (202)659-6671
    mgraziano@eckertseamans.com
16

17

18

19

20

21

22

23

24

25
```

1                     I N D E X

2     STEPHANIE GRANATO:                           PAGE:

3          Examination by Mr. Graziano            5:4

4
                           EXHIBITS
5
      NO.:      DESCRIPTION:                        PAGE:
6

7     12        My Vanilla VISA GPR Card - InComm
                Funding Flow - 04/02/15:
8                                                  7:19

9     13        Program Management and Processing
                Services Agreement - Bancorp Bank:
10                                                 21:9

11    14        Amended and Restated Reload
                Services Agreement - NetSpend
12              Corporation:
                                                   27:5
13
      15        Data Re Proof of Loss:
14                                                 35:11

15    16        E-Mail from Grantschnig to Ging Re
                Claim 11/03/10:
16                                                 51:1

17    17        E-Mail from Ging to Granato Re MC
                Crime Claim - 11/09/10:
18                                                 52:7

19    18        Partial Letter from Meyerhoff with
                Handwritten Notes:
20                                                 53:3

21    19        Handwritten Notes - 07/14/10:
                                                   54:7
22
      20        E-Mail Chain from Ging Re InComm
23              Claim No. 740-501903 - 11/2010:
                                                   57:16
24
      21        Policy Holder Notice:
25                                                 58:11

1    NO.:       DESCRIPTION:                            PAGE:

2

     22        E-Mail Chain Re Crime Claim - Proof
3              of Loss Claim #740502977 - 08/2014:
                                                   64:11
4
     23        E-Mail Chain Re InComm Crime Claim
5              Conference Call 08/2014:
                                                   66:7
6
     24        E-Mail Chain Re 11:00 a.m.
7              Conference Call - 10/2014:
                                                   67:10
8
     25        E-Mail Chain Re List of Items for
9              Great American - 11/2014:
                                                   70:13
10
     26        E-Mail Chain Re InComm:  Items for
11             Great American - 04/2015:
                                                   73:3
12
     27        Crime Insurance Renewal Application
13             for Mercantile Entities:
                                                   79:15
14
     28        Commercial Crime Policy Application
15             for Mercantile Entities:
                                                   79:15
16

17     (Pursuant to OCGA 15-14-37 (a) and (b), a

18   written disclosure statement was submitted by the

19   court reporter to all counsel present at the

20   deposition and is attached hereto.)

21

22

23

24

25

1                    STEPHANIE GRANATO,

2    having been first duly sworn, was examined and

3    testified as follows:

4                    EXAMINATION

5    BY MR. GRAZIANO:

6         Q.  Good morning, Ms. Granato.

7         A.  Good morning.

8         Q.  My name is Mike Graziano.  I represent Great

9    American Insurance Company.  I'm going to be taking

10   the deposition today of -- the continued deposition

11   that we started yesterday of InComm Holdings,

12   Incorporated.  And I understand that you've been

13   designated to testify on behalf of InComm; is that

14   correct?

15        A.  That is correct.

16        Q.  All right.  And I'm going to ask the reporter

17   to show you what we marked yesterday as Exhibit 1.

18        A.  Okay.

19        Q.  Exhibit 1 is the notice of deposition that we

20   served in this case, "we" being Great American.  And

21   my understanding is that you've been designated to

22   testify about topics 1 through 6, 8, 10, 11, and

23   14; is that correct?

24        A.  That is correct.

25        Q.  Okay.  So any questions that I ask you, the

1    answers you give me that are within the scope of those

2    topics, I will take them to be the answers of InComm

3    as opposed to your personal answers.

4         A.   Okay.

5         Q.   Fair enough?

6         A.   Yes.

7         Q.   Have you ever had your deposition taken

8    before?

9         A.   Yes.

10        Q.   All right.  So you're familiar with the

11   process.  I don't have to give you a big introduction.

12   I have just a couple of ground rules in addition to

13   what we already talked about.  One is, if you need a

14   clarification to any question I've asked, you don't

15   understand it, please let me know that you don't

16   understand it, and I'll do my best to rephrase it or

17   clarify it, try to make some sense of it.

18        A.   Okay.

19        Q.   Number 2 is if you want a break at any time,

20   just let me know, and I'll be happy to accommodate you

21   as long as you answer any question that's pending at

22   the time that you request a break.

23        A.   Okay.

24        Q.   And the last and final, but probably most

25   important rule, is that at some point during the

1  deposition it might become kind of conversational.

2  And it's normal in a conversation for people to sort

3  of speak over each other, not because they're being

4  rude, but you might be anticipating my question and

5  trying to help me out if I'm stumbling along.  The

6  problem with that is it makes it very difficult for a

7  court reporter, despite her great talents, to write

8  down what we're saying if we're talking over the top

9  of each other.

10      A.  Understood.

11      Q.  So if you'll do your best to avoid breaking

12  that rule, I'll do my best as well.  Okay?

13      A.  Okay.

14      Q.  All right.  So the first thing that I wanted

15  to ask you about today relates to the flow of funds in

16  connection with the My Vanilla product that InComm

17  has.  I'm going to ask the reporter to mark an exhibit

18  that I hope will help us out with that.

19          (Defendant's Exhibit 12 marked.)

20      A.  Okay.

21  BY MR. GRAZIANO:

22      Q.  All right.  And when I --

23          MR. DIFFLEY:  Make sure you take a look at

24  the whole thing.  Just make -- hang on one second.

25  When he gives you something, just make sure you take a

1    look through the document --

2            THE WITNESS:  Okay.

3            MR. DIFFLEY:  -- before you --

4    BY MR. GRAZIANO:

5        Q.  Yes.  What I actually was about to say, when

6    I hand you a document, you can take as much time or as

7    little to look at it as you want.  And just let me

8    know when you're ready to answer questions about it.

9        A.  Okay.

10       Q.  All right.  Can you tell me what Exhibit 12

11   is if you know?

12       A.  Exhibit 12 is a Bancorp document that shows

13   the flow of funds for the Vanilla.  This first page is

14   the Vanilla Visa GPR card.  So -- and it shows the

15   various types of flows and ways to load the GPR card.

16   So 1a, 1b, 1c are the way the funds get onto the GPR

17   card.  That is -- and then from -- when -- and then --

18   let me see how to best describe this.  I'm sorry.

19           Once it gets onto the card, from there, like

20   2a, 3a, 4a, from that point forward is Bancorp's

21   responsibility and process.

22       Q.  All right.  And there's three separate pages

23   here.  I take it that each of these pages relates to a

24   different product?

25       A.  That is correct.

1      Q.  And the losses that are the basis for

2  InComm's insurance claim that are at issue -- that's

3  at issue in this case, are they all governed by the

4  first page of this document?

5      A.  That is correct.

6      Q.  Okay.  So Pages 2 and 3 really have no

7  bearing on the issues in this case.  Is that your

8  understanding?

9      A.  That is my understanding.

10     Q.  All right.  All right.  I'd like to go

11 through the process a little bit here.  So starting on

12 the left-hand side, 1a, 1b, and 1c that you were

13 talking about, all of those steps are -- I think you

14 described them as InComm responsibilities -- or you

15 described the other stuff as Bancorp's responsibility.

16     A.  Right.

17     Q.  I'm not trying to --

18     A.  So 1a, 1b, 1c is the means by which a GPR

19 card can be loaded with funds.

20     Q.  All right.  So 1a is retail sales.  Is that

21 when a consumer goes into a CVS or a store like that

22 and purchases a physical card?

23     A.  It's when a consumer goes to a retail

24 location and purchases a chit.

25     Q.  All right.  And 1b and 1c are different

1  methods by which a consumer could load funds onto a

2  GPR card?

3      A.   That is correct.

4      Q.   And the losses at issue in this case all

5  relate to transactions involving 1a, or am I wrong

6  about that?

7      A.   1a, that is correct, retail sales.

8      Q.   All right.  So the consumer purchases the

9  product at a retail location.  And what happens with

10 the money that the consumer pays for that product?

11     A.   So a consumer goes to a retail location, pays

12 the retailer for the chit.  So we'll say $500 in this

13 example.  Gives the retailer $500.  The retailer then

14 sends that $500 to InComm.  InComm holds that $500

15 until the consumer redeems the chit, and by "redeems,"

16 that says "I want to load this $500 onto this GPR

17 card."  So upon redemption, InComm then delivers those

18 funds to Bancorp.

19     Q.   All right.  And if we follow 1a from InComm

20 to retail sales, the next block in the flow here says

21 "InComm External Account Client owned Wells Fargo

22 Bank."  Is that -- that's an account that InComm owns?

23     A.   Yes.  So that is where -- let's just use CVS

24 as our retailer example.  So CVS would deliver that

25 $500 to that Wells Fargo Bank account.  And that's

1  where InComm would hold those funds until redemption.

2      **Q.  Is there a standard billing cycle with**

3  **retailers, or does it vary from retailer to retailer?**

4      A.  It varies.

5      **Q.  Okay.  And is it a daily transfer typically**

6  **or a monthly?  I mean, I know you said it varies.  I'm**

7  **just wondering if -- are there arrangements -- sorry.**

8      **Are there arrangements where it takes, say,**

9  **monthly -- a month can pass before InComm is**

10 **reimbursed for the money that the consumer pays?**

11     A.  That would not be typical for this type of

12 product.

13     **Q.  Okay.  What would be typical?**

14     A.  Typically three to seven days.

15     **Q.  All right.  And once InComm receives the**

16 **money, it sits in the Wells Fargo account until the**

17 **consumer redeems the chit, correct?**

18     A.  Correct.

19     **Q.  And once the consumer redeems the chit, what**

20 **happens at that point with the money?**

21     A.  The redemption instructs InComm what product

22 the consumer said, you know -- in this case it's a

23 Vanilla Visa, so -- which is a -- which is issued by

24 Bancorp.  So InComm would then wire those funds to the

25 Bancorp-owned account.

1     Q.  And that is the account in the next block

2     that says "Income Visa GPR Card Funding Account."

3          A.  That is correct.

4          Q.  All right.  And from that point forward, does

5     InComm initiate any transfers?

6          A.  No.

7          Q.  Okay.  And to the best of your knowledge,

8     does the money sit in the card-funding account?  Can

9     we call it the card-funding account?  Can we agree to

10    that?

11         A.  It's -- it's the cardholder account.  Yes.

12         Q.  Cardholder account.  That term's fine.  We

13    can use that.

14         A.  Yes.

15         Q.  So does the money, to the best of your

16    knowledge, sit in the cardholder account until the

17    consumer makes some sort of transaction with the GPR

18    card?

19         A.  Yes, to my knowledge.

20         Q.  All right.  And at that point Bancorp

21    transfers the money out, but presumably to reimburse

22    the third-party merchants, but InComm is not involved

23    in that process?

24         A.  That is correct.

25         Q.  Okay.  What happens if a consumer never uses

1    the money in that cardholder account?  Is there a

2    point in time when a -- does the money just sit in

3    there forever, or does something happen to it?

4        A.  So if the consumer never uses the funds, so

5    they redeemed the funds, and it's sitting in this

6    cardholder account?  My understanding is that, I think

7    based on escheat laws, that it would be escheated to

8    the state or -- or attempts would be made to contact

9    the cardholder and try to get those funds back to the

10   cardholder or escheated.  But that's outside of my

11   expertise, so.

12       Q.  What about the case of cardholder fraud and

13   cards are restricted after the fraud has been

14   discovered?

15       A.  What would happen with those funds?

16       Q.  Yes.

17       A.  That I don't know because that's fraud.  So I

18   mean, in this case those funds are frozen because of

19   the fraud and the ongoing investigation.  So InComm

20   has not been able to touch those funds because they

21   are frozen.  And the cardholder, because it's fraud,

22   cannot use those funds.

23           MR. DIFFLEY:  And let me just interpose an

24   objection.  I think this was in one of the topics that

25   was covered yesterday.  We tried to have Skeet ready

1    to address that, and I think he did.  But you can keep

2    -- keep going.

3          MR. GRAZIANO:  No.  That's -- that's fine.

4    That's actually what I was going to say.

5    BY MR. GRAZIANO:

6          Q.  **You said that -- you started off by saying**

7    **that you don't know because that's fraud.  Is that --**

8    **are you saying that you personally don't know because**

9    **somebody else is responsible for that aspect of the**

10   **business?**

11         A.  Yes.  I don't handle escheatment or -- my

12   role is to wire the funds to Bancorp.  Once they're at

13   Bancorp, my responsibility and InComm's responsibility

14   really -- like we delivered the funds to the

15   cardholder so the cardholder can use those funds.  So

16   our liability has really been fulfilled.  And Bancorp

17   really has the liability from that point forward to

18   that cardholder.  So that's why, I mean --

19         Q.  **I understand.  I -- really I was just trying**

20   **to find out -- I think that your counsel raised a good**

21   **point.  I think that the issue was addressed yesterday**

22   **through Mr. Rolling --**

23         A.  Okay.

24         Q.  **-- so we can move on from that point.**

25             **I noticed that the money involved in the 1b**

1    and 1c transactions, the way this chart -- this chart

2    suggests to me that there's -- before redemption,

3    there's a separate bank account that money involved in

4    1b and 1c transactions is kept in separate from 1a

5    transactions; is that correct?

6         A.   Yes.  So 1b -- so if you, for example, do not

7    have a traditional bank account but, you know, your

8    employer pays you through direct deposit, this is a

9    mechanism you -- you know, you want your funds

10   deposited onto a GPR card, 1b is a mechanism to get

11   your direct -- or get your paycheck onto this card.

12   So we just process that direct deposit through this

13   bank.  So the funds aren't really held at that bank

14   account noted in this box.  We just process that

15   direct deposit.  It really passes through that bank to

16   get to Bancorp.

17        Q.   I see.  Is that because there's -- unlike the

18   1a transaction, there's no delay in terms of

19   redemption, redemption process?

20        A.   Right.  So you've already kind of designated

21   where the funds are going.  So it works a little

22   differently than 1a.

23        Q.   That makes sense.

24             And then the next step with the 1b and 1c

25   funds is that they're put into the same cardholding

1    account that the 1a funds are put into --

2        A.  Yes.

3        Q.  -- once redemption occurs with respect to the

4    1a transaction?

5        A.  Yes, at Bancorp.

6        Q.  And are the funds from the different types of

7    transactions segregated in the cardholder account in

8    any manner?

9        A.  I don't know.

10       Q.  Is -- would anyone at InComm know, or is that

11   a better question for Bancorp?

12       A.  That's a better question for Bancorp.

13       Q.  So when it says, the first bank account we

14   discussed, "External Account Client Owned," "Client"

15   is referring to InComm; is that correct?

16       A.  That is correct.

17       Q.  All right.  Because this is a Bancorp

18   document.

19           All right.  If you look down at the narrative

20   under Step A --

21           MR. DIFFLEY:  1a?

22           MR. GRAZIANO:  Yes, 1a.

23   BY MR. GRAZIANO:

24       Q.  -- the second to the last sentence says "Load

25   funds are forwarded to the InComm my Vanilla VISA GPR

1    Funding account held at Bancorp on a 15-day delay."

2    What does the 15-day delay refer to?

3        A.   That 15-day delay refers to the required

4    terms in the Bancorp agreement.  And I do not

5    necessarily agree with the wording that they have in

6    this because it's within 15-days.  It's not on day 15.

7    It's within.  So the contract says "within 15 days."

8        Q.   All right.  So the contract says that InComm

9    within 15 days of a redemption has to put the money

10   into the cardholder account?

11       A.   That is correct.

12       Q.   What is InComm's -- does InComm have a

13   standard practice with respect to how often it funds

14   the cardholder account?

15       A.   The standard practice is to fund within one

16   day of redemption.

17       Q.   So redemptions occur on day one.  And then on

18   day two, InComm would sweep all of the money into the

19   account to cover the redemptions from day one?

20       A.   Right.  So redemption, day one.  On day two

21   we would wire the funds to Bancorp.

22       Q.   Okay.  Are there ever any exceptions to that

23   practice, or is it pretty much always followed?

24       A.   I'm sure there are exemptions that -- for the

25   most part, it is always within day one.

1     Q.  Yesterday Mr. Rolling testified that InComm

2  discovered the losses at issue in this case on May

3  6th, 2014.  I'm just trying to give you a time frame

4  here.  Did InComm at that point deviate from the

5  standard practice of sweeping funds into the

6  cardholder account within a day of redemption?

7     A.  I would have to go back and review the -- our

8  transfer history.  But I don't recall that we did.

9     Q.  Using a hypothetical, let's say that I had a

10 GPR card that's been loaded with value from a chit and

11 I tried to buy a bottle of aspirin at CVS -- I did buy

12 a bottle of aspirin at CVS, do you know how CVS gets

13 reimbursed for the cost of the aspirin?

14    A.  Generally, my understanding is that the Visa

15 network would reach to Bancorp to get the cost,

16 whatever the cost of the aspirin is.  So this one's

17 for CVS.  But I don't know exactly how that works.

18 But that's just a general understanding of the

19 process.

20    Q.  Does InComm have any role at all in that

21 process?

22    A.  The only role that InComm has in the process

23 is to ensure that the cardholder is able to use the

24 card.  The -- InComm does not have any role in the

25 settlement of the funds between CVS and Bancorp.

1      Q.  So in some manner or another -- we don't have

2  to get too technical -- the merchant would check with

3  InComm to make sure that the funds are available?  Or

4  it would -- it would be InComm stores the information

5  about whether the funds are available?

6      A.   InComm -- well, InComm Financial Services is

7  the program manager.  As the program manager, they

8  hold the card account balances.  InComm is the

9  processor.  So as the processor, we are responsible

10  for ensuring that the transaction occurs.  As the

11  program manager, we say, yes, there are sufficient

12  funds on this card to allow the transaction to occur.

13      Q.  All right.  Thank you for that.

14      A.   Does that explain it?  Did I answer your

15  question?

16      Q.  I think -- I think it does.

17      A.   Okay.

18      Q.  And just so you know, I'm not trying to trip

19  you up in respect to the different entities that

20  are --

21      A.   Right.  No.  I was -- like it's a tri-party

22  agreement.  So there are different roles for each.

23  And there's messaging that goes back and forth to

24  allow that transaction to occur.

25      Q.  Sure.  I appreciate that, and I appreciate

1    the clarification.

2          My understanding from the deposition

3    yesterday is that if I call to load a chit onto my GPR

4    card, then it's almost immediate -- almost immediately

5    available for me to make a purchase.  Is that your

6    understanding as well?

7        A.   That's my understanding.

8        Q.  So what happens in the event that I do that

9    and the cardholder funds -- since there's a delay of

10   one day between the redemption and InComm funding the

11   cardholder account.

12       A.   So --

13       Q.  Do you understand what I'm saying?

14       A.   Right.  So the cardholder still gets to use

15   their card because that's between Bancorp and the

16   cardholder.  I don't know.

17       Q.  Fair enough.

18       A.   But that's -- you know, that -- that's their

19   liability, so.

20          Then the agreement is within 15 days we have

21   to fund it.  The agreement also requires that we

22   maintain sufficient balances in this account so that

23   the cardholder can use the card.

24       Q.  Okay.  So is -- does InComm maintain reserve

25   accounts in connection with the product?

1    A.   There may be.  I don't know though.

2    Q.  **So on a given day, is -- is the balance of**

3    **the cardholder account, does it actually exceed the**

4    **amount of money available to consumers, to**

5    **cardholders?**

6    A.   That I do not know because that is managed by

7    the InComm Financial Services accounting group.

8    Q.  **I see.  All right.**

9         MR. GRAZIANO:  Let's mark Exhibit 13.

10        (Defendant's Exhibit 13 marked.)

11   A.   Okay.  So . . .

12        MR. DIFFLEY:  He'll ask you some questions.

13        THE WITNESS:  Okay.

14   A.   Okay.

15        MR. DIFFLEY:  He wants you to see where you

16   go with it.

17        THE WITNESS:  Yes.

18        MR. DIFFLEY:  Rather than you having to look

19   at every page, he'll probably make a representation to

20   you about it.

21        THE WITNESS:  Okay.

22   BY MR. GRAZIANO:

23   Q.  **With the understanding that you have not,**

24   **sitting here today, reviewed the entire document, do**

25   **you believe that Exhibit 13 is an accurate copy of the**

1    contract between Bancorp and InComm that you were

2    referencing earlier?

3        A.  Yes.

4        Q.  And this was in effect during the entire time

5    period of the losses that are the subject of the

6    insurance claim?

7        A.  Yes.

8        Q.  All right.  Now, if you would turn, please,

9    to Page -- Page 10 of 52.

10       A.  Okay.

11       Q.  Section 2.9(c) discusses what it refers to as

12   a cardholder account.

13       A.  Okay.

14       Q.  Is that the same cardholder account that

15   we've been discussing this morning?

16       A.  Yes.

17       Q.  Okay.  So the -- and that means that when the

18   redemption of a chit occurs, the funds from the

19   consumer make their way into the cardholder account

20   described in 2.9(c), correct?

21       A.  Yes.

22       Q.  Is the description of the cardholder account

23   and how it's titled in 2.9(c) accurate?

24       A.  Yes.  I -- yes.  I've never seen the "for the

25   benefit of ICTL" and IH FL portion of this title.

1    I've always just seen the Bancorp Bank for the

2    cardholder, for the benefit of the cardholder.  So

3    I've never seen the other two pieces of that title.

4    But otherwise, yes, I agree with the title.  It is

5    bank owned.

6        Q.  All right.  And -- so do you dispute that the

7    title of -- that the title of the bank account

8    includes the language "for the benefit of ITC" --

9        A.  I don't dispute it.  I've just never seen

10   that portion of the title.  The -- I know that this

11   bank account is in Bancorp's tax ID, therefore is bank

12   owned in my opinion and from what I know.  I've --

13   I've just never seen the entire title.

14       Q.  And you're not aware of any agreements

15   between Bancorp and InComm with respect to the title

16   of the account other than what's in Exhibit 13?

17       A.  No.  So -- no.

18       Q.  All right.  A couple of sections up in

19   2.9(a), it says "Program manager shall ensure that

20   each Load Amount associated with the reloadable card

21   [sic] is deposited into the Cardholder Account within

22   15 calendar days following the loading of such funds

23   on to such card."  Is this the source of the 15-day

24   application you were discussing earlier?

25       A.  Yes.

1      Q.  All right.  Section -- on the next page,

2    Section 2.9(d), the first clause of the first sentence

3    says "The parties further acknowledge and agree that

4    Program Manager shall be the holder (as such term is

5    defined under state unclaimed property laws) of all

6    Cardholder Balances."  First of all, is that -- are

7    you aware of any agreements that are contrary to that

8    statement between Bancorp and InComm?

9      A.  I'm not aware of any other agreements.

10     Q.  And the "program manager," I believe you

11   identified it earlier, but if you could again, I'd

12   appreciate it.

13     A.  Who the program manager is?

14     Q.  Yes.

15     A.  Well, at this point it was ITCFL.  But ITCFL

16   has been renamed to InComm Financial Services.

17     Q.  And what is the understanding of the rights

18   that this status of being the holder of the cardholder

19   balances confers upon the program manager?

20     A.  So "holder" does not mean that we have rights

21   to the funds.  "Holder," in my opinion and from -- to

22   my knowledge, means that we report on the balances and

23   inform the cardholder, you know, here are the

24   balances.  You know, host the website for the

25   cardholder to log in to to inquire on their balance,

1  that we do not have rights to -- we don't have those

2  funds.  We don't hold the funds.  The bank holds the

3  funds.

4      Q.  Is there any agreement between Bancorp and

5  InComm, whether in Exhibit 13 or elsewhere, that

6  shifts the risk of loss from -- for cardholder fraud

7  from one party to another?

8          MR. DIFFLEY:  Objection.  To -- excuse me.

9  Objection.  Form.

10          You may answer.

11      A.  Okay.  Can you repeat the question?

12  BY MR. GRAZIANO:

13      Q.  Yes.  Are you aware of any agreements between

14  Bancorp and InComm, whether in Exhibit 13 or not, that

15  shifts the risk of loss from cardholder fraud as

16  between InComm and Bancorp?

17          MR. DIFFLEY:  Same objection.

18      A.  I believe there is something in this document

19  that says InComm bears the loss for fraud.

20  BY MR. GRAZIANO:

21      Q.  And whether it's in this document or not, is

22  that your understanding of the relation -- the

23  contractual relationship between the two parties?

24      A.  I believe so.  Although, I'm not intimately

25  -- I don't really know this agreement that well.  I

 1    don't work that closely with Bancorp.  The InComm

 2    Financial Services CFO really is the one that works

 3    closely with them.  So he's the one that intimately

 4    knows this and the relationship and how it all works.

 5        Q.  All right.  If you turn to Page 6 of 52, this

 6    is a -- what I believe is a definitions section.

 7    There's a definition of "Settlement Account" here.  It

 8    says "means the account maintained by bank used for

 9    Settlement of all Transactions initiated by use of a

10    card by or on behalf of a Cardholder."  Does InComm

11    have any information about the settlement account?

12        A.  Just that that's how the process works.

13        Q.  Does InComm have access to any of the

14    information that's in the account, for example,

15    balances, things of that nature?

16        A.  I don't believe we have access to balances.

17    I don't believe so.  I mean, I believe that InComm can

18    see spend -- from the card perspective, like what the

19    cardholder is using the card for.  But I don't believe

20    we can see what's going on in this settlement account

21    at all.

22        Q.  And does InComm have any ability to initiate

23    transactions or restrict transactions in respect to

24    the settlement account?

25        A.  Not to my knowledge.

1          (Defendant's Exhibit 14 marked.)

2     A.   Okay.

3  BY MR. GRAZIANO:

4     Q.   All right.  And I'm going to ask you the same

5  question with respect to Exhibit 14 that I did with

6  Exhibit 13.  With the understanding that you've not

7  had a chance to read the entire document sitting in

8  front of you here today, is it your belief that

9  Exhibit 14 is a complete and accurate copy of the

10 contract which governs InComm's card programs with --

11 involving NetSpend Corporation?

12    A.   As far as I know.

13    Q.   All right.  And what -- what can you tell me

14 about, just a broad overview, the differences between

15 the NetSpend program and the My Vanilla program?

16    A.   My knowledge is somewhat limited.  But from

17 what I know, the differences are the Vanilla is a --

18 the Vanilla program is -- it's an InComm product.  So

19 we are responsible for -- like I said, we're a process

20 -- we are the processor, so we are responsible for

21 ensuring that transaction occurs.  We're -- you know,

22 we can see redemptions -- not redemptions.  Let me --

23 where the cardholder is spending that card because we

24 are the processor.

25          NetSpend, we cannot see that activity, so we

1    rely on NetSpend to give us -- and -- and -- I don't

2    know if an invoice is the right terminology.  But we

3    rely on them to say, you know, "Here the transactions.

4    You need to pay us for this," I believe.

5         Q.  Okay.  So is --

6         A.  But I would have to validate that.

7         **Q.  If a consumer goes into a store and buys a**

8    **product that relates to NetSpend, where does the money**

9    **from the consumer go?**

10        A.  Okay.  So the flow of funds is -- is similar.

11        Q.  Okay.

12        A.  So they go into CVS, buy a chit to reload

13   their NetSpend reloadable card, their GPR card.  The

14   CVS would send that $500 to InComm.  InComm would hold

15   that $500 until the cardholder redeems that $500 to

16   their NetSpend card.  Upon redemption, InComm would

17   deliver that $500 to NetSpend instead of Bancorp.

18        **Q.  Okay.  And does InComm have any involvement**

19   **with the funds after it delivers them to NetSpend?**

20        A.  No.

21        **Q.  Okay.  So -- and prior to delivering them to**

22   **NetSpend, InComm maintains the funds in their own**

23   **accounts?**

24        A.  Yes.  I should say, we deliver them to

25   whatever bank account NetSpend has instructed us to

1    deliver them to, whatever those -- whatever bank

2    account that is.

3         Q.   And InComm has no rights or interest in the

4    bank accounts into which the funds are transferred --

5         A.   No.

6         Q.   -- once the redemption occurs?

7         A.   No.

8         Q.   All right.  Are you aware of any -- well,

9    does Exhibit 14, to the best of your knowledge, govern

10   all of the transactions at issue in this case which

11   relate to the NetSpend product?

12        A.   For this particular product, to my knowledge,

13   yes.

14        Q.   And are you aware of any other written

15   agreements between NetSpend and InComm that relate to

16   this product?

17        A.   Not -- for this product, no.

18        Q.   Do you know if, once the cardholder fraud was

19   discovered, the -- NetSpend did anything to restrict

20   access to the funds that were being held on the

21   cardholder's behalf?

22        A.   I was not involved, so I don't know.

23        Q.   Okay.  Do you know if NetSpend has made any

24   insurance claims in connection with the loss?

25        A.   I don't know, but I don't believe so because

1    NetSpend is not out any money.  InComm is.

2        Q.  Pursuant to the agreement between NetSpend

3    and InComm, is there -- do you know who bears the risk

4    of loss?  I mean, is there anything in this contract?

5        A.  I don't know.  I'd have to read it.

6        Q.  What's the basis for InComm being on the hook

7    for the loss in connection with the NetSpend program?

8        A.  Well, we believe the transactions to be

9    legitimate.  So we transferred the funds to NetSpend.

10   We did not know they were fraud.

11       Q.  Has InComm ever made any demand upon NetSpend

12   to return the money?

13       A.  We did not.

14       Q.  Okay.  All right.  If you would, please, turn

15   to Page 17.  And we're looking at Section 10.2(e) and

16   (f).  (e) says "Any losses arising from any fraudulent

17   activity in connection with a Reload Pack, other than

18   for which NetSpend is responsible pursuant to this

19   Section 10.2, shall be the responsibility of InComm

20   except to the extent related to any breach of this

21   Agreement by NetSpend, or the fraud, willful

22   misconduct or gross negligence of NetSpend, any

23   Issuing Bank, or any of their service providers or

24   their respective affiliates, employees, contractors or

25   representatives."

 1          So in this context, what is -- what is a

 2    reload pack?

 3        A.   A reload pack would be the chit.

 4        Q.   All right.  Now, Section 10.2(f) says "Any

 5    losses arising from any fraudulent activity in

 6    connection with a Card or the redemption of a NetSpend

 7    Reload Pack, other than that for which InComm is

 8    responsible pursuant to this Section 10.2, shall be

 9    the responsibility of NetSpend, except to the extent

10    related to any breach of the agreement by InComm or

11    Licensee, or the fraud, willful misconduct or gross

12    negligence of InComm, Licensee, or any Approved InComm

13    Retailer, or their respective affiliates, employees,

14    contractors or representatives."

15          Now, this is obviously very similar language

16    to 10.2(e).  And with the -- what I can tell the

17    primary difference being that it discusses fraudulent

18    activity in relation to a card or the redemption of a

19    NetSpend Reload Pack.  What is the difference with

20    this long-winded explanation between a NetSpend Reload

21    Pack as described in 10.2(f) and a reload pack as

22    described in 10.2(e)?

23          MR. DIFFLEY:  Objection.  Form.

24        A.   I believe the difference between (e) and (f)

25    is that the reload pack referenced in (e) is InComm's

1    product, but the NetSpend Reload Pack is NetSpend's

2    product.  So (e) is the chit that we have been talking

3    about versus (f) is NetSpend's product and InComm is

4    not responsible for.  We may activate or have part of

5    that product.  I am not familiar with NetSpend's

6    Reload Pack product at all.

7    BY MR. GRAZIANO:

8        Q.  Okay.  So --

9        A.  But that is not InComm's proprietary product

10   based on my read of these definitions.

11       Q.  So your understanding of these definitions is

12   that -- well, why would -- why would the contract say

13   anything about a NetSpend Reload Pack if InComm had no

14   involvement with it at all?

15           MR. DIFFLEY:  Object to the form.

16       A.  I don't know why that's in there.

17   BY MR. GRAZIANO:

18       Q.  Okay.  So you don't know -- do you know for

19   sure whether InComm has any involvement with NetSpend

20   Reload Packs?

21       A.  I don't know for sure.

22       Q.  Okay.  And your understanding is that the

23   reload packs -- the products that are at issue in this

24   case that relate to the loss are the reload packs

25   referred to in (e) and not (f)?

1    A.  Yes.

2    Q.  All right.  On Page 4, the definition

3  section, definition 1.41 refers to -- defines NetSpend

4  Reload Pack as a reload pack that only bears -- I'm

5  not going to read the whole thing.  You can read it.

6  Upon reading that definition, does it refresh your

7  recollection at all about any involvement InComm may

8  or may not have with respect to NetSpend Reload Packs?

9    A.  It does not.  It -- there's -- no.  It does

10  not.  InComm activates and is involved with many,

11  many, many products.  So we could activate this

12  product but not have any other responsibility for it.

13  I -- this is -- this doesn't mean anything other than

14  this is not InComm's product.

15    Q.  All right.  I want to talk about the damages

16  claimed by InComm in the case for a little bit

17  starting with the actual amount of the -- the amounts

18  that make up a part of the insurance claim.

19         Yesterday we learned that there were two

20  separate issues with InComm's IVR system that resulted

21  in multiple redemptions, one which involved two phone

22  calls being made by a chit holder and the other of

23  which involved a technical issue involving timeouts.

24  Are you -- is that your understanding as well?

25         MR. DIFFLEY:  I'll interpose an objection

1    because that mischaracterizes the testimony from

2    yesterday.

3    BY MR. GRAZIANO:

4        Q.  **Well, why don't you tell me what your**

5    **understanding is.**

6        A.  The --

7            MR. DIFFLEY:  Also interpose an objection.

8    This is outside the scope.  But if you want her

9    understanding, she can answer.

10       A.  My understanding is that the fraud occurred

11   by two people calling in -- or more than one person

12   calling in to the IVR at one time to redeem a unique

13   serial number off of a chit at the same time.

14   BY MR. GRAZIANO:

15       Q.  **How did InComm calculate the amount of the**

16   **loss?**

17       A.  We looked at all the redemptions of a unique

18   serial number, looked at the valid -- the first and

19   valid redemption of that unique serial number.  And

20   all the redemptions of that unique serial number

21   thereafter should not have occurred and are therefore

22   fraudulent and duplicate.  So all of those thereafter

23   are part of the loss.

24       Q.  **Okay.  So every single multiple redemption**

25   **that was discovered during the time period of the loss**

1    is included in the calculation?

2        A.   Within -- yes.

3        Q.   Okay.  No attempt was made to distinguish

4    between multiple redemptions that resulted from two

5    phone calls being made as opposed to any other source?

6        A.   I don't understand the question.

7        Q.   Who calculated the loss?

8        A.   Our business intelligence team provided the

9    data from our transaction platform system.

10       Q.   All right.  And -- I'll have the reporter

11   mark Exhibit 15.

12            (Defendant's Exhibit 15 marked.)

13       A.   Okay.

14   BY MR. GRAZIANO:

15       Q.   Are you familiar with Exhibit 15?

16       A.   I am.

17       Q.   And what is it?

18       A.   This is the data behind our proof of loss.

19       Q.   And it breaks down the loss based on what?

20       A.   The GPR card that was reloaded.

21       Q.   All right.  So the -- several of these use

22   the phrase "My Vanilla."  Are each one of those

23   categories governed by the contract we looked at

24   earlier which is Exhibit 13?

25       A.   Yes.

1    Q.  Okay.  So -- all right.  And the same

2    question with respect to each one of the categories

3    that uses the phrase "NetSpend."  Are they governed by

4    the contract we discussed earlier that is marked as

5    Exhibit 14?

6    A.  To my knowledge, yes.

7    Q.  So all of your earlier testimony about how

8    the flow of funds worked in connection with each one

9    of those two programs would apply to what we're

10   looking at on Exhibit 15?

11   A.  Yes.

12   Q.  All right.  And we've got some additional

13   ones -- additional ones at the bottom.  Is InComm

14   seeking to recover loss relating to the program with

15   American Express?

16   A.  We included it on our proof of loss.

17   Q.  Okay.  And is that -- are those products

18   governed by a separate contract?

19   A.  Yes.

20   Q.  Okay.  Has that --

21   MR. DIFFLEY:  And Mike, I don't mean to

22   interrupt or send you down a rabbit hole, but I think

23   we have told you and said in our discovery responses

24   that the AMEX portion of this is not being sought as

25   damages in this case.

1          MR. GRAZIANO:  Okay.

2          MR. DIFFLEY:  So --

3          MR. GRAZIANO:  Then we can move right along.

4          MR. DIFFLEY:  -- that might save you a little

5    time.

6          MR. DIFFLEY:  With that, if you want to ask,

7    ask away.

8          Off the record.

9          (Off the record.)

10   BY MR. GRAZIANO:

11       **Q.  Has InComm made any attempt to reconcile the**

12   **amount of the multiple redemptions with the amount**

13   **that the cardholders actually spent?**

14       A.  Not to my knowledge because the spend is --

15   our loss occurred once we delivered those funds to

16   Bancorp, so we're responsible for processing

17   transactions, but -- as a processor, but our loss

18   occurred once we delivered the funds to Bancorp.  So

19   no.

20       **Q.  I'm just trying to find out what information**

21   **you have.  So I know Mr. Rolling testified yesterday**

22   **there was $1.9 million, approximately, that was frozen**

23   **because cards were restricted, correct?**

24       A.  Yes.

25       **Q.  And I'm just trying to figure out if once you**

 1    subtract that from the total amount of the loss, do we

 2    -- does InComm know if every remaining penny has

 3    actually been spent by consumers or withdrawn from

 4    ATM's or is some of it still remaining in the

 5    cardholder account?

 6        A.   Are you asking if that 1.9 is still remaining

 7    in the cardholder account?

 8        Q.   No.  I'm sorry.  I tried to carve out the

 9    1.9.

10        A.   Okay.

11        Q.   It was probably a poorly-phrased question.

12             So we've got the total amount of loss.

13        A.   Yes.

14        Q.   Subtract the 1.9 from it.  Do we know if any

15    of that remaining amount is still sitting in the

16    cardholder account today?

17        A.   I don't believe that it is, or else we would

18    have been able to freeze more than the 1.9.  But I

19    don't know that we have done a reconciliation.

20        Q.   Okay.  And the total amount of the loss

21    that's claimed in the pleadings, the 11 point some

22    million minus the American Express, includes the 1.9

23    that was frozen, correct?

24        A.   Yeah, but let me clarify.  We can't reconcile

25    and -- and see balances on anything but the My

 1    Vanilla.  We -- we can't see card balances on NetSpend

 2    at all.

 3        Q.  **Fair enough.  And I'll take it that your**

 4    **testimony in this regard --**

 5        A.  All right.

 6        Q.  **-- all relates to the My Vanilla program.**

 7        A.  Sorry.  Sorry.  Can you ask the question

 8    again?

 9        Q.  **If I can remember it.**

10            MR. GRAZIANO:  Can you read it back?

11            THE REPORTER:  "Okay.  And the total amount

12    of the loss that's claimed in the pleadings, the 11

13    point some million minus the American Express,

14    includes the 1.9 that was frozen, correct?"

15        A.  Yes.

16    BY MR. GRAZIANO:

17        Q.  **Okay.  What damages besides the amount of the**

18    **loss is InComm seeking to recover in this case?**

19        A.  We are seeking to recover less than American

20    Express, the 11.5 million minus American Express,

21    whatever that math works out to be.

22        Q.  **Okay.  Anything else?**

23        A.  Attorney fees.

24        Q.  **Okay.  Fine.  Anything else?**

25        A.  I believe we have a bad faith claim.

1      Q.   And what damages does InComm seek to recover

2  in connection with that bad faith claim?

3      A.   I believe it's 50 percent of the claim.

4      Q.   Okay.  The --

5      A.   Whatever the law --

6      Q.   -- the statutory --

7      A.   Yes, whatever the law allows.  I'll say that.

8      Q.   Okay.  Let me see how I can phrase this

9  without using legalese.  Is InComm seeking to recover

10 any lost profits that it claims it could have made if

11 the claim had been paid or anything of that nature?

12     A.   Not to my knowledge, no.

13     Q.   Okay.

14          MR. GRAZIANO:  Do you want to take a break?

15 It's a good time for me.

16          MR. DIFFLEY:  Sure.  Yes.

17          (Recess 10:03-10:14 a.m.)

18 BY MR. GRAZIANO:

19     Q.   All right.  InComm made a claim to Great

20 American for a different loss in 2010, correct?

21     A.   Yes.

22     Q.   Okay.  Can you tell me about the factual

23 basis for that claim?

24     A.   Yes.  In 2010, InComm made an update to its

25 system and unknowingly created -- or there was an

1    error during that update.  And that error allowed

2    cardholders to spend more than they had on their card.

3    So InComm was not passing back the correct message at

4    the retail location.  So at the retail location the

5    cardholder could use their card for more than they

6    had.

7        Q.  And was the program similar to the one we

8    described today?

9        A.  No.

10       Q.  In what ways were they different?

11       A.  I believe that program was just a one-time

12   use gift card.  It was not a reloadable card to my

13   knowledge.

14       Q.  And do you know how the funds were held after

15   the consumer purchased the product, but before it was

16   used at a -- at a merchant?

17       A.  If it was a one -- if it was a single-use

18   gift card, the retailer would have collected -- at the

19   time of purchase, the retailer would have collected

20   the funds, whenever that was, remitted those funds to

21   InComm.  InComm would have delivered those funds to

22   Bancorp within 30 days.

23       Q.  And that was a similar arrangement in -- in

24   respect to the funds are being held in a Bancorp

25   account before the consumer uses them?

1    A.  Yes.  A different Bancorp account, but yes.

2    Q.  Understood.  And so . . .

3        And Great American denied that claim,

4    correct?

5    A.  Yes.

6    Q.  And one of the reasons Great American gave

7    for denying the claim is that the loss to InComm was

8    indirect, correct?

9    A.  Yes.

10   Q.  And was it explained to InComm that the basis

11   for that decision was that the loss resulted from

12   InComm's contractual liability in connection with the

13   merchant transactions as opposed to a direct loss?

14   A.  I believe so.

15   Q.  And InComm eventually decided not to pursue

16   that claim any longer?

17   A.  InComm made a business decision to not

18   continue to pursue it.  Yes.

19   Q.  And what was the reason for that business

20   decision?

21   A.  InComm actually filed a claim with both Great

22   American and CNA, which was its E&O carrier.  We were

23   seeking coverage.  We didn't know which one best fit.

24       Ultimately we were able to come to an

25   agreement under our E&O, with our E&O carrier.  We did

1   not agree with Great American's decision to deny the

2   claim because we did feel like it was crime, but we

3   were able to reach a settlement with our E&O carrier.

4   And it was our year end, so we made a business

5   decision to -- we were at least able to recover half,

6   and we moved on.

7        Q.  How was the -- what was the total amount of

8   the loss?

9        A.  The total amount of the loss was

10  approximately 1.9 million, I believe.

11       Q.  And how much did CNA pay?

12       A.  It was $850,000.

13       Q.  And was InComm able to recover the remaining

14  amount of the loss from any other source?

15       A.  No.

16       Q.  CNA, I take it, since they only paid a

17  portion of the claim, denied the claim.

18       A.  They did.

19       Q.  And what was the basis that they gave for

20  denying the claim?

21       A.  There was no claim made against InComm.

22       Q.  It was liability insurance, and there was no

23  claim?

24       A.  Correct.

25       Q.  Did InComm take the position that it would be

1    liable to MasterCard if MasterCard -- if InComm had

2    not paid?

3        A.  I believe that was the position.

4        Q.  And that was the --

5        A.  Well, actually, I don't know if that was the

6    position.  I believe our position was because of the

7    flow of funds there could never be a claim.  I don't

8    know that it was directly because of MasterCard.  But

9    it was -- was because of the flow of funds.

10       Q.  Is it fair to say that there could be no

11   claim because of the short time frame in which InComm

12   had to fund the account?

13       A.  I believe so.

14       Q.  Okay.  So -- but if InComm had not funded the

15   account, it would expect to be sued by MasterCard,

16   correct?

17            MR. DIFFLEY:  Objection.  Form.

18            You can answer.

19       A.  I don't know who we would have expected to be

20   sued by, actually.

21   BY MR. GRAZIANO:

22       Q.  Okay.  So -- but InComm had a contractual

23   obligation to fund an account within 30 days.  I think

24   you said that earlier, right?

25       A.  Yes.

1    Q.  And whoever InComm owed that obligation to

2    could potentially sue if InComm had not made the

3    payment.

4    A.  Yes.

5    Q.  And was that fact -- did InComm -- did InComm

6    use that fact in arguing with CNA as to why there

7    should be coverage under the E&O policy?

8    A.  I was really not part of the negotiations, so

9    I don't know.

10   Q.  Okay.  Did InComm make a claim for the loss

11   that's at issue in this case under any of its E&O

12   policies?

13   A.  No.

14   Q.  Why not?

15   A.  It's -- it was not an error.  It was a crime.

16   It was fraud.

17   Q.  Okay.  So if a consumer spends more money

18   than they've paid to InComm in connection with a

19   nonreloadable card, it's different than if they do it

20   with a reloadable card?

21   A.  In this case fraudsters dialed in to our

22   system, created fraudulent transactions that then

23   caused me to wire funds to Bancorp.

24   Q.  And --

25   A.  Which we believed to be legitimate

 1    transactions.

 2        Q.  And the reason they were able to do that is

 3    because of a programming error made by InComm,

 4    correct?

 5        A.  No, not to my knowledge.

 6        Q.  Okay.  Well, why was -- why did InComm's

 7    system allow multiple redemptions?

 8            MR. DIFFLEY:  And you may answer that.

 9            I'll interpose an objection.  It's outside of

10    the scope of the topics for which she's been

11    designated.

12        A.  I don't know why it allowed it.

13    BY MR. GRAZIANO:

14        Q.  Okay.  And with respect to the 2010 claim,

15    was -- what was the error or omission that was the

16    basis for the claim?

17        A.  It was a code change required by MasterCard.

18    I don't know what that code change was.  But when we

19    updated our system, it omitted the -- the message that

20    was passed back to a retailer that said there's not

21    enough funds on this card.  That is a general

22    understanding of what occurred.

23        Q.  Other than what you've already testified to,

24    is there any other reason that InComm did not make a

25    claim under the E&O policy for the loss at issue in

1    this case?

2        A.  No.

3        Q.  Who was InComm's insurance broker during the

4    period of time of the 2010 claim?

5        A.  J. Smith Lanier.

6        Q.  And is -- who is Angie Grantschnig?

7        A.  She worked for J. Smith Lanier.

8        Q.  Am I saying that right?

9        A.  Yes.

10       Q.  Who is Ken Johnson?

11       A.  He also worked for J. Smith Lanier.  I don't

12   remember his exact role, though.  It was claims --

13   something to do with claims, I believe.

14       Q.  Did InComm consult any J. Smith Lanier

15   employees about whether there was likely to be

16   coverage under the Great American policy in connection

17   with the 2010 claim?

18       A.  We would have discussed the claims with J.

19   Smith Lanier.  Yes.

20       Q.  Who had those conversations?

21       A.  Myself, Mary Ging who works for me.  Likely

22   Scott Meyerhoff, our CFO.

23       Q.  Did the broker express an opinion about

24   coverage?

25       A.  I believe they had.

1      Q.   What was the opinion?

2      A.   I do not believe they thought the crime

3    policy that -- I don't think -- I don't believe they

4    believed any of the definitions in the crime policy

5    fit.

6      Q.   Okay.  Did they provide any more details

7    about the basis of their opinion that you're aware of?

8      A.   Not that I really remember.

9      Q.   Did InComm -- well, who was the broker for

10   InComm when the 2014 claim was made?

11     A.   J. Smith Lanier.

12     Q.   Did that change at some point in time?

13     A.   In 2015, we changed to Wells Fargo.

14     Q.   Why did InComm change to Wells Fargo?

15     A.   Wells Fargo is one of our -- they're in our

16   credit bank.  We have a large syndicate of banks for

17   our credit facility.  And they're always asking for

18   other business to try to -- try to keep them happy.

19   And that was actually one area that we had talked

20   about for quite some time to try to move over, so.

21     Q.   So it wasn't based on any dissatisfaction

22   with J. Smith Lanier?

23     A.   Not at all.

24     Q.   Did InComm have -- consult with either of its

25   brokers in connection with whether there was coverage

1  under the Great American policy for the 2014 claim?

2      A.  It would not have consulted at all with Wells

3  Fargo.  On 2014, I don't recall.  But possibly.

4      Q.  Who -- who would know?  Who communicated with

5  the broker regularly?

6      A.  On --

7          MR. DIFFLEY:  On claims issues?

8          MR. GRAZIANO:  Yes, on claims issues.

9      A.  I mean, on claims issues, it would have been

10  myself.

11  BY MR. GRAZIANO:

12      Q.  Okay.  How about Mary Ging?

13      A.  Mary Ging, it depends on the claim -- it

14  depends on the claim.

15      Q.  Is Mary a current employee?

16      A.  Yes.

17      Q.  What's her -- what's her title?  What does

18  she do?

19      A.  She's treasury manager.  She primarily

20  handles like the day-to-day type stuff, though,

21  contract reviews, you know, is this insurance

22  provision okay.

23      Q.  Now, that actually reminds me -- I don't know

24  how I omitted this.  But I did not ask what your title

25  was.

1     A.   Oh.   I'm the vice president and treasurer.

2     Q.   All right.  And how long have you held that

3  title?

4     A.   Seven years.

5     Q.   And without getting into too great of detail,

6  can you give me just a brief overview of your

7  professional background of your career?

8     A.   Primarily in treasury my whole career.  So

9  had risk management responsibility for about the last

10  seven.  Been treasury for all 22 years, you know,

11  accounts -- finance accounting, you know, all areas.

12  Wear a lot of different hats in kind of all those

13  areas.

14     Q.   How long have you worked for InComm?

15     A.   Seven years.

16     Q.   Where were you prior to that?

17     A.   I was at Eclipsys Corporation for a year.

18  And prior to that I was with PerSay Technology for 13.

19     Q.   All right.  I think we're on Exhibit --

20          MR. DIFFLEY:   16.

21  BY MR. GRAZIANO:

22     Q.   -- 15 -- 16.

23          (Defendant's Exhibit 16 marked.)

24     A.   Okay.

25  BY MR. GRAZIANO:

1     Q.  Did you review Exhibit 16 in preparation for

2  your deposition?

3     A.  Yes.

4     Q.  Did you review the redacted copy or the

5  unredacted copy?

6     A.  I reviewed the redacted.

7     Q.  Does Exhibit 16 refresh your recollection

8  about any information that J. Smith Lanier provided to

9  you about the possibility of coverage under the

10 agreement or the policy?

11    A.  Yes.

12    Q.  Okay.  And what is it -- how so?

13    A.  We felt very strongly that it was crime.

14 People -- there were arrests in this case.  We felt

15 like it was -- there was fraud because people had been

16 arrested.  I mean, there were -- I mean, there were

17 very clear cases.  We had arrest records that we felt

18 that it was crime.  We didn't understand how it

19 wasn't.  So Angie was saying, "It's not.  You think

20 it's crime.  It's not," so.

21    Q.  Okay.  And any more details about the reason

22 Angie did not believe it was crime?

23    A.  Based on the definitions in the insuring

24 agreements.

25    Q.  Okay.  And did you drill down with her into

1    the specific definitions and why it wouldn't apply?

2        A.  I don't recall, but possibly.

3        Q.  All right.

4            (Defendant's Exhibit 17 marked.)

5        A.  Okay.

6    BY MR. GRAZIANO:

7        Q.  Did you review Exhibit 17 in preparation for

8    your deposition?

9        A.  Yes.

10       Q.  Did you review the redacted or the unredacted

11   version?

12       A.  Redacted.

13       Q.  And are you -- are either you or Mary Ging a

14   licensed attorney?

15       A.  No.

16       Q.  All right.  Does Exhibit 17 refresh your

17   recollection with respect to any additional

18   information we haven't discussed about the opinion

19   provided by J. Smith Lanier regarding coverage under

20   the crime policy?

21           MR. DIFFLEY:  Objection to form.

22       A.  Nothing additional.

23   BY MR. GRAZIANO:

24       Q.  Okay.

25           (Defendant's Exhibit 18 marked.)

1      A.   Okay.

2    BY MR. GRAZIANO:

3      Q.   Exhibit 18 is -- has some typewritten words

4    on it and some handwritten words.  What I want to ask

5    you about is the handwritten words.

6      A.   Okay.

7      Q.   Do you recognize the handwriting?

8      A.   I believe this is Mary's handwriting.

9      Q.   All right.  And are you familiar with Mary's

10   handwriting?

11     A.   Somewhat.

12     Q.   Okay.  Does Exhibit 18 refresh your

13   recollection about any additional information that J.

14   Smith Lanier provided with respect to its opinion

15   about coverage under the crime policy?

16     A.   No.

17     Q.   Okay.  And there's a statement on here that

18   says "Define more clearly how," it looks like, "when

19   suffered the loss."  Do you know what that refers to?

20     A.   My guess is funds were transferred from

21   InComm's account to the relevant accounts that had the

22   direct relationship with MasterCard.  So my -- my

23   guess would be that is referring to the funds transfer

24   took place before InComm ever learned about the fraud.

25   "Define more clearly . . ."

1          I -- I don't know what this means.  These are

2    Mary's notes.

3          Q.  Fair enough.

4              (Defendant's Exhibit 19 marked.)

5          A.  Okay.

6    BY MR. GRAZIANO:

7          Q.  Do you recognize the handwriting in Exhibit

8    19?

9          A.  I believe it's Mary's.

10         Q.  Have you seen Exhibit 19 before today?

11         A.  No.

12         Q.  There's a notation on here that says "But MC

13   would sue us if they didn't have ability to debit our

14   account."  Did you have any conversations with Mary

15   about that issue?

16         A.  No, and that's incorrect.

17         Q.  Why is that incorrect?

18         A.  Because MasterCard cannot debit our account.

19   They debit Bancorp's account.

20         Q.  The cardholder account that we --

21         A.  Yes.

22         Q.  The next page there's a notation that says

23   "Spirit of E&O we S/B covered, by the letter of the

24   law we're not."  Does that refresh your recollection

25   about any conversations you had with respect to

1   coverage with the E&O policy for the 2010 claim?

2       A.   Just that there would not be a demand against

3   us.

4       Q.   And the next notation says "Next E&O policy

5   put in wording to cover this type of loss."  Was that

6   suggestion ever acted upon?

7       A.   Yes.

8       Q.   And with CNA?

9       A.   I believe.  I don't know if it was CNA.  But

10  in the next policy, yes.

11      Q.   All right.  And what was -- what specifically

12  -- what language specifically was added to make sure

13  it would cover the type of loss involved in the 2010

14  claim?

15      A.   I'd have to go back and look at it.  But

16  effectively it was meant to cover the funds flow

17  because we're really never in control of funds flow.

18  And it was not specific to just cards, this type of

19  card.

20      Q.   And this was meant to address the reason that

21  CNA denied the claim initially?

22      A.   It highlighted -- this -- the 2010 loss

23  highlighted that InComm is never in control of the

24  funds.  The funds are always passed to us from a

25  retailer, or we're not in control -- we're -- we're in

 1   the middle.  So we're often not -- we're not in

 2   control of the funds.  So that's -- the 2010 loss

 3   highlighted that.

 4       Q.  And since InComm is not in control of the

 5   funds, that's the reason no claim was made for

 6   purposes of E&O coverage, correct?

 7           MR. DIFFLEY:  Objection to form.

 8       A.  For which loss?

 9   BY MR. GRAZIANO:

10       Q.  For the 2010 loss.

11       A.  We did file a claim in 2010 for E&O.

12       Q.  I'm referring to -- not the claim filed by

13   InComm, but you said earlier that the reason CNA

14   denied the claim initially was because there was -- no

15   claim --

16       A.  Yes.

17       Q.  -- was made against InComm, correct?

18       A.  Correct.

19       Q.  All right.  And that was the problem -- or

20   the issue that InComm sought to avoid with respect to

21   future E&O policies?

22       A.  Yes.

23       Q.  And I know you said you don't know the exact

24   language that was used.  But whatever it was, did it

25   continue to be used in InComm's E&O policies up to and

1    through 2014?

2         A.  I believe so.

3         Q.  Okay.  And did InComm at any point, after the

4    2010 claim, negotiate with Great American about

5    changing the language of the Great American policy so

6    that it would cover -- so that the basis for the

7    denial of the 2010 -- excuse me.  Strike all of that.

8              Did InComm negotiate any additional language

9    or language changes in the subsequent Great American

10   policies based on what happened with the 2010 claim?

11        A.  Not to my knowledge.

12        Q.  Okay.

13             (Defendant's Exhibit 20 marked.)

14        A.  Okay.

15   BY MR. GRAZIANO:

16        Q.  Did you review Exhibit 20 in preparation for

17   your deposition today?

18        A.  Yes.

19        Q.  Did you review the redacted or unredacted

20   version?

21        A.  Redacted.

22        Q.  Who is Lauren Weatherly?

23        A.  She works -- I believe she's in the fraud

24   department, worked for Skeet.

25        Q.  I don't have anything else for you on that.

1          Did InComm make any insurance claims in

2    connection with the 2014 loss that's at issue in this

3    case other than the claim to Great American?

4         A.   No.

5         Q.   During the relevant time period, InComm

6    maintained a specialty risk policy with Chartis,

7    correct?

8         A.   Yes.

9              (Defendant's Exhibit 21 marked.)

10   BY MR. GRAZIANO:

11        Q.   Is Exhibit 21 the specialty risk policy that

12   was in effect during the period of the -- in which the

13   loss at issue in this case was discovered?

14        A.   Yes.

15        Q.   Does Exhibit 21 provide coverage generally

16   for both of the plaintiffs who are in this -- named in

17   this case?

18        A.   Yes.

19        Q.   And why did InComm not make a claim under the

20   policy?

21        A.   None of the insuring agreements apply.

22        Q.   Okay.

23        A.   And again, it was a fraud event.  It was a

24   crime.

25        Q.   All right.  If you will, please turn to Page

```
 1    1 -- I'm sorry.  That's -- okay.  You can --

 2            MR. DIFFLEY:  You mean the Bates number?

 3    BY MR. GRAZIANO:

 4        Q.  These are separately labeled.  Bates Number

 5    2944.

 6        A.  Okay.

 7        Q.  And this is the "Security Failure/Privacy

 8    Event Management Insurance Provision."  Tell me why

 9    InComm does not believe that the loss at issue in this

10    case is covered under the insurance provision.

11        A.  This coverage is meant to -- meant to hire

12    consultants that come in to help you stop the event,

13    the security failure.  This is not crime.  This is not

14    fraud.  This is not what is stolen from you.  This is

15    not funds transfer loss as a result of the fraud.

16        Q.  Did InComm hire any consultants?

17        A.  Not to my knowledge, no, not as a result of

18    the fraud.

19        Q.  We can move off of that.

20            All right.  What facts does InComm claim

21    prove that Great American acted in bad faith?

22        A.  The amount of time that it took to provide a

23    decision.  We provided documents over and over at

24    times.  We asked for a decision.  They asked for more

25    time.  They also deny -- the reasons for denying the
```

1  claim.  Still in discovery, so there could be more

2  that comes out of that, but . . .

3      **Q.  What documents were provided over and over**

4  **again?**

5      A.  We -- we had to explain what happened in the

6  funds flow over and over and over.  We had multiple

7  phone calls.  We had an on-site meeting for two days.

8  We walked them through, you know, very detailed, very

9  detailed, spreadsheets detailing the loss.  We

10  provided multiple people at their disposal, you know,

11  to give them whatever they needed.  They continued to

12  ask the same questions over and over.

13      **Q.  What specific documents did they ask for over**

14  **and over and over?**

15      A.  I'd have to go back and look at my notes.

16      **Q.  Okay.  And you said you had to explain the**

17  **funds flow over and over and over.  How many times?**

18      A.  I'd have to go back and look at my notes.

19      **Q.  To whom?**

20      A.  Rachel St. Louis.

21      **Q.  How many times to Rachel St. Louis?**

22      A.  Every time we had a phone call, probably.

23  But again, I'd have to look at my notes.

24      **Q.  Okay.  How many times did you have a phone**

25  **call?**

1      A.  I'd have to look at my notes, but probably at

2  a minimum three to four phone calls.

3      Q.  Okay.

4      A.  This was over a period of months, several

5  months.

6      Q.  **You said that Great American asked for more**

7  **time to give a decision.  What -- give me the**

8  **background of that.**

9      A.  I believe when we asked for a decision, they

10  said they'd have one in 45 days.  And they came back

11  and said they needed 45 more business days.

12      Q.  **Was it provided within 45 calendar days, the**

13  **decision?**

14      A.  I'd have to go back and look.

15      Q.  Okay.

16          MR. GRAZIANO:  Let's take a break.

17          MR. DIFFLEY:  Okay.

18          MR. GRAZIANO:  This is going -- off the

19  record.

20          (Recess 10:47-10:57 a.m.)

21  BY MR. GRAZIANO:

22      Q.  **Do you know when InComm first provided notice**

23  **of its loss in connection with the claim at issue in**

24  **this case?**

25      A.  I believe it was around July of 2014, but I

 1   don't recall the exact date.

 2        Q.  Let's -- I'm going to ask the reporter to

 3   show you Exhibits 3 and 4.  I think that will help.

 4        A.  Okay.

 5        Q.  All right.  Does Exhibit 3 refresh your

 6   recollection as to when InComm provided notice of the

 7   loss?

 8        A.  Notice, yes.

 9        Q.  What date?

10        A.  It looks like May 23rd, 2014.

11        Q.  Okay.  And does Exhibit 4 -- well, you don't

12   even need to refer to the exhibit.  Can you tell me

13   when InComm provided a proof of loss to Great

14   American?

15        A.  It was July 18th, 2014.

16        Q.  The cover e-mail I believe is dated July 21st

17   on Exhibit 4; is that correct?

18        A.  Yes.

19        Q.  Do you know if the proof of loss was provided

20   earlier than July 21st, or was that the first

21   transmission?

22        A.  I'd have to go back and look at the calendar.

23   But we may have sent it to J. Smith Lanier.  I don't

24   know.

25        Q.  Okay.

1      A.  We prepared it.  It looks like we dated it

2  July 18th.  I don't know the reason why the cover

3  letter is July 21st.

4      **Q.  Either way, there's approximately two months**

5  **between InComm's notice of loss and InComm's proof of**

6  **loss, correct?**

7      A.  Yes.

8      **Q.  Now, what was InComm doing in those two**

9  **months?**

10      A.  Preparing the data behind -- or for the proof

11  of loss.

12      **Q.  And why did that take two months?**

13      A.  I don't recall.

14      **Q.  Was it complicated to gather and analyze the**

15  **amount of data at issue in this case?**

16      A.  I don't know.

17      **Q.  There's approximately how many transactions**

18  **at issue?**

19      A.  I believe 25,000, but I'd have to go back and

20  look.  If it's in . . .

21      **Q.  What was included with the proof of loss when**

22  **InComm submitted the proof of loss to Great American?**

23      A.  We provided a written summary of what

24  occurred, a sworn affidavit on the form required by

25  Great American, and I believe there was a spreadsheet

1    that showed the number of transactions and the chits

2    that were involved in the loss.

3         Q.  Do you know if InComm provided anything --

4    any other documents with its proof of loss?

5         A.  I don't recall, but I'd have to go back and

6    -- and look.  I mean, I don't recall.

7              (Defendant's Exhibit 22 marked.)

8         A.  Okay.

9    BY MR. GRAZIANO:

10        Q.  All right.  Page 4.  Beginning on Page 4 and

11   going on to Page 5 of Exhibit 22 is an August 13th,

12   2014, e-mail from Rachel St. Louis to Mary Ging,

13   amongst other people, correct?

14        A.  Yes.

15        Q.  Who is Cynthia Hale?

16        A.  She works for J. Smith Lanier.

17        Q.  Okay.  And in that e-mail, Rachel

18   acknowledges the proof of loss, asks for some

19   additional information and to set up a conference

20   call, correct?

21        A.  Yes.

22        Q.  Is a part of InComm's bad faith claim based

23   on the delay between the proof of loss and this

24   acknowledgment e-mail?

25        A.  I don't believe so.

1      Q.  And you said a bunch of -- you said documents

2   were requested over and over and over again and

3   information.  Is any of that the information that's

4   listed in that August 13th e-mail?

5      A.  I'd have to go back and see what the

6   repetitive requests were.

7      Q.  If it's sitting here today, there's nothing

8   in this e-mail that you believe was repetitive?

9      A.  I mean, probably pieces, yes.  I mean, how

10  are the funds paid?  I mean, she does not -- she does

11  not understand the funds flow.  So there are probably

12  pieces to all of these questions, yes, that were

13  repetitive.

14     Q.  When, prior to August the 13 of 2014, did

15  InComm provide information about the funds flow to

16  Rachel St. Louis?

17     A.  Prior to August 13th?  I don't recall.  I

18  believe this was the first of the phone calls, but I'd

19  have to go back and look.

20     Q.  Okay.  And if you follow the e-mail chains,

21  it appears that a conference call is set up for

22  Friday, August the 22nd, correct?

23     A.  Yes.

24     Q.  Do you know if that call occurred?

25     A.  I'd have to go back and look at my calendar.

1      Q.  Do you know if InComm's broker canceled the

2  phone call?

3      A.  I don't recall.

4          (Defendant's Exhibit 23 marked.)

5      A.  Okay.

6  BY MR. GRAZIANO:

7      Q.  Have you seen Exhibit 23 before?

8      A.  Possibly.

9      Q.  Does this refresh your recollection about

10 whether it was InComm's broker that canceled the

11 conference call?

12     A.  Yes.

13     Q.  And is -- was it InComm's broker that

14 canceled the conference call?

15     A.  It appears so.

16     Q.  Do you know anything about the subsequent

17 attempts by the party to reschedule the conference

18 call?

19     A.  Yes.  I believe that based on -- I'd have to

20 go back and look at my notes to confirm.  But I

21 believe that based on these questions, the meeting

22 that we next held was to really explain InComm overall

23 because we wanted them to understand InComm first

24 before trying to explain a GPR product.  So I believe

25 that's why we rescheduled the call, because we needed

1    to get the right parties together to explain InComm.

2       Q.  Okay.  Do you know when the call finally

3    occurred?

4       A.  No.  I'd have to go back and look at my

5    notes.

6       Q.  Okay.

7          (Defendant's Exhibit 24 marked.)

8       A.  Okay.

9    BY MR. GRAZIANO:

10      Q.  Exhibit 24 references an October 3rd

11   conference call.  Do you know who was on the line for

12   that call?

13      A.  I don't.

14      Q.  Is that -- do you know if that's the call

15   during which InComm provided the overview of what

16   InComm does?

17      A.  I believe it occurred prior to that, but I'd

18   have to go back and look at my notes.

19      Q.  Okay.  And at some point Great American had

20   requested to visit InComm's facilities --

21      A.  Yes.

22      Q.  -- and meet with InComm to discover more

23   information about the loss, correct?

24      A.  Uh-huh.

25      Q.  Was there any information sought by that

1   meeting that InComm had already provided and is

2   claiming was duplicative?

3       A.  I'm sure we -- I'd have to go back and look

4   at my notes.  But I'm sure we again explained funds

5   flow.

6       Q.  You're sure based on what?

7       A.  I'm -- I'm sure that we explained the same

8   things again.

9       Q.  Were you at the meeting?

10      A.  On October 27th and 28th?  Yes, but I'd --

11      Q.  Were you --

12      A.  -- I'd have to look at my notes, though.

13      Q.  Were you involved in any of the prior

14  conversations?

15      A.  Yes.

16      Q.  And during which -- there was a prior

17  conversation in which the funds flow was explained to

18  somebody?

19      A.  Yes.

20      Q.  Okay.  When did that occur?

21      A.  I believe in the prior phone calls that,

22  again, I'd have to look at my notes.

23      Q.  Who was a party to those phone calls?

24      A.  Myself.  The very first phone call, our

25  general counsel.  The subsequent meetings we had

1    another general counsel who's very familiar with the

2    product.  Our CFO for InComm Financial Services was

3    there.  Our business intelligence director, myself.

4    We had our -- our CTO was there.  Skeet Rolling

5    participated.  It was a variety of people.

6        **Q.  And who were Great American's representatives**

7    **at the meeting, the in-person meeting?**

8        A.  At the in-person meeting, they had the

9    forensic accountants.  They had forensic IT.  They had

10   the underwriter, Rachel and John Retinger.

11       **Q.  Were all of those people involved in the**

12   **prior phone call during which the funds flow was**

13   **explained?**

14       A.  Rachel and John were.  I don't recall if the

15   others were.

16       **Q.  Okay.  In this October 7th e-mail, Mary Ging**

17   **apologizes because she had a hard time getting in**

18   **touch with people that are traveling.  Is that the**

19   **reason why there was a delay between the conference**

20   **call and the meeting?**

21       A.  Possibly, but we were coordinating quite a

22   number of people to meet with Great American.

23       **Q.  Okay.  And up until this point in time, what**

24   **had Great American done that shows it was acting in**

25   **bad faith?**

1        A.  I don't know that we -- I don't know.

2        Q.  During the meeting in person in October of

3    2014, did the forensic accountants or forensic IT

4    specialists request any additional information or

5    documents?

6        A.  I'm sure they did.  I don't recall, though.

7    I'd have to look at my notes.

8        Q.  Does InComm claim that any of those requests

9    were duplicative as a part of the bad faith claim?

10       A.  Not to my knowledge.

11           (Defendant's Exhibit 25 marked.)

12   BY MR. GRAZIANO:

13       Q.  Okay.  Exhibit 25, that first e-mail in the

14   chain is a November 3rd, 2014 e-mail from Mary Ging to

15   Rachel St. Louis, correct?

16       A.  Yes.

17       Q.  And it lists eight items, documents, and

18   information that was being requested from InComm to

19   adjust the claim, correct?

20       A.  Yes.

21       Q.  Do you know if this -- if these requests came

22   from Great American itself or either of the

23   consultants that have been hired?

24       A.  I don't remember who made the requests.

25       Q.  Okay.  And did InComm ever object to these

1    requests and say that "They're duplicative.  We've

2    already provided this information"?

3        A.  I don't recall.

4        Q.  Are any of these requests duplicative of

5    anything that had been provided prior to this date,

6    November the 3rd?

7        A.  At this point in time, I don't believe we

8    would have objected because we were still trying to be

9    -- we were still trying to work with them.

10       Q.  Well, maybe "object" is the wrong word.  Did

11   InComm point out or say, "Hey, look.  We've already

12   given you some of this stuff"?

13       A.  Not that I recall, but we may have.

14       Q.  Item Number 7 says "Contracts."  Do you know

15   what that refers to?

16       A.  I believe they requested the Bancorp

17   contract, but I'm not sure that's what that refers to.

18       Q.  And that's the -- okay.  You believe.  Okay.

19   Fair enough.

20           But you believe that the Bancorp contract,

21   which was Exhibit 13 we looked at earlier today, was

22   requested on or around November the 3rd, 2014?

23       A.  I believe so.

24       Q.  Okay.  If you look at the next e-mail in the

25   chain, it's November 19th, and it's e-mail from Rachel

1  to -- St. Louis to Mary Ging, requesting some

2  additional items, correct?

3      A.  Yes.

4      Q.  Do you know if InComm had responded to the

5  requests in the November 3rd e-mail as of the date

6  that the November 19th e-mail was sent?

7      A.  I don't know.  I'd have to go back and look.

8      Q.  And do you know -- did InComm ever point out

9  or say that any of these items in the November 19th

10 request were duplicative of things that had been

11 provided previously?

12     A.  I don't know.

13     Q.  Item Number 1 says "Please provide copies of

14 the contract between InComm and Bancorp," correct?

15     A.  Yes.

16     Q.  And did InComm ever say -- take a position

17 that any of the information requested in the November

18 the 3rd or November 19th e-mails was irrelevant to the

19 claim?

20     A.  I would have to go back and review.  I don't

21 know.  I -- I believe we did, but I -- again, I need

22 to go back and -- and review.

23     Q.  Okay.  What information is -- is InComm now

24 claiming that any of the information or documents are

25 irrelevant?

 1      A.   Well -- I don't know.

 2      Q.   Okay.

 3           (Defendant's Exhibit 26 marked.)

 4      A.   Okay.

 5   BY MR. GRAZIANO:

 6      Q.   If you look at the first e-mail in the chain

 7   which was a November 24th, 2014 e-mail from Mr. Lewis,

 8   who is here with us today, he objected to producing --

 9   well, I don't want to characterize it.  He said "We

10   have some hesitation providing you a copy of this

11   agreement," which refers to the Bancorp contract.  Is

12   that your understanding?

13      A.   Yes.

14      Q.   "Based on confidentiality concerns."

15      A.   Yes.

16      Q.   Okay.  Hadn't InComm produced a copy of a

17   contract without its amendments in 2010 to Great

18   American?

19      A.   We had.

20      Q.   And did not raise any confidentiality

21   concerns at that time?

22      A.   Yes.  Although, we did not know that at the

23   time.  Or did not recall that at the time.

24      Q.   In 2014, you did not recall that you had

25   produced a copy of the contract in 2010?

1      A.   No.

2      Q.   Okay.  I understand.

3           What changed between 2010 and 2014 that made

4      the document suddenly so confidential it could not be

5      produced to InComm's insurer?

6      A.   Different counsel.

7      Q.   And by "different counsel," you're referring

8      to Mr. Lewis and the person who made the decision in

9      2010 was a different person?

10     A.   Correct.

11     Q.   Skipping ahead to -- I'll provide a Bates

12     number for you.  January 23rd, 2014, it's on Bates

13     Page 932, the bottom of Page 932.

14     A.   Okay.

15     Q.   There's discussion over a PDF containing

16     spend transaction data that was produced to Great

17     American and Great American had requested that it be

18     converted to an Excel spreadsheet.  Are you familiar

19     with that issue?

20     A.   Somewhat.

21     Q.   What information does spend transaction data

22     refer to?

23     A.   What the cardholders used the fraudulent

24     funds for.

25     Q.   And is it with respect to every single one of

 1    the transactions at issue?

 2        A.  I'm sorry?  Can you -- I don't understand the

 3    question.

 4        Q.  Yes.  Spend transaction data is information

 5    about the manner in which the -- what the cardholders

 6    used to purchase -- what they purchased with the

 7    cards?

 8        A.  What they purchased with the fraudulent

 9    funds, yes.

10        Q.  All right.  And did that information include

11    every transaction that's a part of the loss that's at

12    issue in this case?

13        A.  I don't know.

14        Q.  Was the PDF -- was it a large spreadsheet?

15        A.  I -- I've seen a sample of it.  I don't know

16    if it was -- I would assume, but I -- I would have to

17    go back and look at the spreadsheet.

18        Q.  Do you know if the PDF's were usable?  Did --

19        A.  Based on what I saw, yes.

20        Q.  So information about a single transaction was

21    all contained on one page?

22        A.  Based on what I saw, yes.

23        Q.  But not sortable since it's in PDF form and

24    not Excel.  That's sort of a technical question.  You

25    don't have to answer that.

1          And in between -- prior to this January 23rd

2    e-mail, there had been some discussion about InComm's

3    confidentiality objection to the contract, producing

4    the contracts.  And as of January 23rd, Mr. Lewis

5    acknowledges that Great American is requesting a copy

6    of the Bancorp contract, correct?

7          A.  Yes.

8          Q.  Do you know when that contract was produced?

9          A.  Ultimately, no.

10          Q.  Okay.  There's a February 13th e-mail at

11    9:29.  Strike that.

12          All right.  Bates stamped 928, it's a

13    February 23rd, 2015 e-mail from Rachel St. Louis to

14    Ryan Lewis, amongst others.  And there's a sentence

15    just before the reservation of rights sentence that

16    says "It was also agreed that Great American will

17    provide a coverage opinion within 45 days of the

18    receipt of the outstanding contracts and amendments."

19    Did InComm agree to that time frame?

20          A.  I don't know.

21          Q.  Do you know if anybody ever objected to the

22    statement in this e-mail that --

23          A.  I don't know.

24          Q.  And it doesn't clarify whether it's 45

25    business days or calendar days, does it?

1        A.  It says "45 days."

2        Q.  All right.  And if you'll turn to Page 927,

3    the bottom half of the document has an e-mail dated

4    March 6th, 2015, from Mr. Lewis to Ms. St. Louis in

5    addition to others.  And it indicates that the

6    amendments to the Bancorp contract are attached.  Do

7    you know if those documents had been provided to Great

8    American on any date earlier than March 6th, 2015?

9        A.  Not to my knowledge.

10        Q.  And turning to page -- backwards, to 926.  At

11    the top there's an e-mail on March 30th, 2015, from

12    Mr. Lewis to Mr. Retinger, Ms. St. Louis, amongst

13    others that says the NetSpend contracts are being

14    provided.  Do you know if InComm provided the NetSpend

15    contract to Great American on any date earlier than

16    March 30th, 2015?

17        A.  I don't know.

18        Q.  All right.  And so can we agree that if there

19    was an agreement to provide a coverage opinion within

20    45 days with the receipt of the outstanding contracts

21    and amendments, the clock would begin to tick on March

22    30th, 2015?

23        A.  I -- I don't know.

24        Q.  Okay.  The last two e-mails in this,

25    Mr. Lewis says on April the 2nd, 2015, that he's

1    confused by the commitment to May 29th which is 60

2    days and not 45 days after InComm sent the

3    documentation.  "Could you clarify whether Great

4    American now intends to take this additional time."

5    And that was sent at 11:56 a.m. on April the 2nd,

6    2015, correct?

7    A.  Yes.

8    Q.  Okay.  And earlier when I asked you about the

9    bases for the bad faith claim, you listed four things.

10    One of them had to do with Great American asking to

11    take additional time to give a coverage opinion.  Is

12    that -- does this e-mail relate to that issue?

13    A.  Yes.

14    Q.  And approximately three hours later, Rachel

15    St. Louis responded and said "I did 45 business days;

16    however, since John and I did not specify, it will be

17    45 days which will take us to May 14th, 2015."  Is

18    that response the entire basis for the allegation we

19    were just speaking about?

20    A.  It's not the entire basis, no.

21    Q.  Okay.  What else is there?

22    A.  The long delay in sharing information, going

23    back and forth.

24    Q.  Well, you told me -- excuse me.  One of the

25    four reasons you gave was that Great American asked

1    for more time to give a coverage opinion.  Is that

2    based on the April 2nd exchange?

3        A.  Yes.

4        Q.  Okay.  Was it based on anything else other

5    than that exchange?

6        A.  No.

7        Q.  Were there any phone calls related to that

8    issue?

9        A.  Not that I recall.

10       Q.  Okay.  So -- all right.

11           (Defendant's Exhibits 27 through 29

12   marked.)

13       A.  Okay.

14   BY MR. GRAZIANO:

15       Q.  All right.  Exhibits 27 through 29 are

16   applications for insurance submitted by InComm to

17   Great American, correct?

18       A.  Yes.

19       Q.  And Exhibit 27 is dated -- it looks like it

20   was signed in 2013.  Is that your signature on the

21   second page?

22       A.  Yes.

23       Q.  And it incorporates the previous application,

24   correct?

25       A.  Yes.

1      Q.   And is that previous application Exhibit 28?

2      A.   Yes.

3      Q.   Exhibit 28 is signed by you in 2012; is that

4   correct?

5      A.   Yes.

6      Q.   And it also incorporates the next preceding

7   application, correct?

8      A.   Yes.

9      Q.   Is the agreement that's incorporated by

10   Exhibit 28, Exhibit 29?

11      A.   Yes.

12      Q.   Okay.  So Exhibit 29 -- well, Exhibit 27 was

13   the application to renew the policy that -- that

14   eventually became the one that the -- the claim at

15   issue in this case is made under, correct?

16      A.   Yes.

17      Q.   In Exhibit 29, Section 3, "Internal

18   Controls," the first subpart says "Bank accounts.  Are

19   bank accounts reconciled monthly?"  And the answer is

20   "Yes."  What exactly -- who reconciled the bank

21   accounts on a monthly basis?

22      A.   Accounting does.

23      Q.   Okay.  And what individuals were responsible

24   for it?

25      A.   It depends on the bank account.

1      Q.   All right.  How about the bank account in

2  which -- well, does InComm reconcile the bank -- the

3  cardholder account that was used?

4      A.   No.

5      Q.   Okay.  Does InComm reconcile the bank account

6  into which funds were -- funds from retail sales of

7  GPR cards or chits, in particular, were deposited

8  before the redemptions occur?

9      A.   Yes.

10      Q.   And what exactly did reconciling that account

11  consist of?

12      A.   I don't perform those procedures, so I can't

13  tell you exactly what that entails.  But I would

14  assume that we ensure that funds from -- I don't know

15  what it entails to be honest.

16      Q.   Who -- who was responsible for reconciling

17  that account?

18      A.   The accounting team.  We -- we have a

19  multitude of accounts, and we have a large accounting

20  team.  I don't know exactly who was responsible.

21      Q.   All right.  And you don't know -- do you know

22  if they matched -- reconciled the sales revenue with

23  the redemptions that were made on the cards?

24      A.   The sales revenue with the --

25      Q.   For -- from chits.

1       A.   Sales revenue from chits to the redemptions?

2       **Q.  Yes.**

3       A.   I don't know that.

4       **Q.  The money coming in from the sales compared**

5  **to the --**

6            **(Interruption.)**

7            THE REPORTER:  I'm sorry.  I couldn't hear

8  you.

9            (Off the record.)

10  BY MR. GRAZIANO:

11      **Q.  The question is just was the amount -- was**

12  **the money coming in from sales of chits reconciled**

13  **with the money going out when the chits were redeemed?**

14      A.   That would be an operational

15  reconciliation --

16      **Q.  Okay.**

17      A.   -- not an accounting reconciliation.  I don't

18  know if they do that, but I -- that's more of an

19  operational reconciliation, not an accounting

20  reconciliation.

21           MR. GRAZIANO:  All right.  Let's take a

22  break.  I may be done.

23           MR. DIFFLEY:  Okay.

24           MR. GRAZIANO:  I'm not making any promises --

25           MR. DIFFLEY:  Sure.

1        MR. GRAZIANO:  -- but I want to look over a

2    couple of things.

3        MR. DIFFLEY:  Okay.

4        (Recess 11:38-1:46 a.m.)

5        MR. GRAZIANO:  I have no more questions for

6    today.  I am -- we are going to hold the deposition

7    open.  I'm not saying that we're definitely going to

8    take it again.  But based on the fact that we got a

9    document production last week and several thousand

10   documents, we haven't had to -- the ability to do a

11   thorough review of a privilege log a day before the

12   deposition started, but we may end up challenging some

13   of the entries.  So there may be a need to re-open,

14   and there may not.

15       With that said, I have nothing further.

16       MR. DIFFLEY:  Well, I'll just say that I

17   think that both of our designees were prepared to

18   address all the topics that were set forth in the

19   notice.  But I'm sure you and I will talk if you want

20   to proceed.

21       Nothing further.  She will also read and

22   sign.

23       (The deposition adjourned at 1:47 a.m.)

24       (Signature reserved.)

25

1                    C E R T I F I C A T E

2    STATE OF GEORGIA      )
                           )
3    COUNTY OF HENRY       )

4         I hereby certify that the foregoing

5    deposition was taken down, as stated in the caption,

6    and the colloquies, questions and answers were

7    reduced to typewriting under my direction; that the

8    foregoing transcript is a true and correct record of

9    the evidence given.

10        The above certification is expressly

11   withdrawn and denied upon the disassembly or

12   photocopying of the foregoing transcript, unless

13   said disassembly or photocopying is done under the

14   auspices of TrustPoint Reporting, Certified Court

15   Reporters, and the signatures and original seal is

16   attached thereto.

17        I further certify that I am not a relative

18   or employee or attorney of any party, nor am I

19   financially interested in the outcome of the action.

20        This, the 7th day of June, 2016.

21

22                    _____

23                    Anne Hansen
                      Registered Professional Reporter
24                    Certified Court Reporter, #2711
                        Commission expires 3/31/2017

25

1                    D I S C L O S U R E

2    STATE OF GEORGIA     )
                          )
3    COUNTY OF HENRY      )

4

5          Pursuant to Article 10.B of the Rules and

6    Regulations of the Board of Court Reporting of the

7    Judicial Council of Georgia, I make the following

8    disclosure:

9          I am a Georgia Certified Court Reporter

10   here as a representative of TrustPoint Reporting to

11   report the foregoing matter.

12         TrustPoint Reporting is not taking this

13   deposition under any contract that is prohibited by

14   O.C.G.A Sec. 9-11-28 (c).

15         TrustPoint Reporting will be charging its

16   usual and customary rates for this transcript.

17

18

19

20

21

22

23

24

25